# METROPOLITAN EDISON CO. *v.* NATIONAL LABOR RELATIONS BOARD ET AL.

No. 81–1664.   Argued January 11, 1983—Decided April 4, 1983

POWELL, J., delivered the opinion for a unanimous Court.

*Donald F. Sileo* argued the cause for petitioner. With him on the briefs was *Anthony A. DeSabato.*

*Norton J. Come* argued the cause for respondent National Labor Relations Board. With him on the brief were *Solicitor General Lee, Deputy Solicitor General Wallace, Jerrold J. Ganzfried, Robert E. Allen, Linda Sher,* and *Elinor Hadley Stillman. Laurence J. Cohen* argued the cause for re-

spondent Local Union 563, IBEW. With him on the brief were *Richard Kirschner, Marsha Berzon,* and *Laurence Gold.**

JUSTICE POWELL delivered the opinion of the Court.

The issue is whether an employer may discipline union officials more severely than other union employees for participating in an unlawful work stoppage.

## I

Metropolitan Edison Company began construction of a two-unit nuclear generating station at Three Mile Island in 1968. Over half of its employees were represented by the International Brotherhood of Electrical Workers. Article XI of the collective-bargaining agreement between the company and the union provided:

> "The Brotherhood and its members agree that during the term of this agreement there shall be no strikes or walkouts by the Brotherhood or its members, and the Company agrees that there shall be no lockouts of the Brotherhood or its members, it being the desire of both parties to provide uninterrupted and continuous service to the public." App. to Pet. for Cert. A–32.

Despite this no-strike clause, union members participated in four unlawful work stoppages between 1970 and 1974.[1] On each occasion the company disciplined the local union officials more severely than the other participants. Twice the union filed a grievance because of the disparate treatment accorded

---

*Briefs of *amici curiae* urging reversal were filed by *Peter D. Walther, Mark M. Wilcox,* and *Stephen A. Bokat* for the Chamber of Commerce of the United States; by *Lawrence T. Zimmerman, Steven R. Semler,* and *Robert L. Baum* for the Edison Electric Institute; and by *Mallory Erle Phillips, Jr.,* and *Mark E. Edwards* for Miller Brewing Co.

[1] Although the collective-bargaining agreement applicable to the incident in this case took effect on May 1, 1976, the no-strike clause has remained unchanged at all relevant times.

its officials, and in both cases the arbitrators upheld the company's actions.[2] They found that union officials have an affirmative duty to uphold the bargaining agreement. The breach of that duty justified the company's imposition of more severe sanctions.

On August 30, 1977, an unrelated union, the Operating Engineers, set up an informational picket line at the entrance to the Three Mile Island construction site. When members of the Electrical Workers union refused to cross the picket line, company officials spoke to David Lang, the local union president. They told him that he had a duty as a union official to ensure that the Electrical Workers' members complied with the no-strike clause. It was the company's view that Lang could fulfill this duty only by crossing the picket line and thereby inducing other employees to follow.

Although instructed repeatedly to cross the line, Lang declined to do so. He was aware that the other employees were unlikely to follow him and sought instead to learn the cause of the picket line. On being told that the line would not be removed unless the Operating Engineers' business agent ordered it, Lang attempted to reach him. He also directed Gene Light, the Electrical Workers' vice president, to

---

[2] In 1972, Metropolitan Edison disciplined union officials more severely than the other employees for not instructing striking employees to return to work. The company's actions were upheld by the arbitrator, who found "that Union officials have an *affirmative duty* to protect the authority of the Union leadership from illegitimate action on the part of employees, and to uphold the sanctity of the Agreement and its established grievance procedures." App. to Pet. for Cert. A–60 (emphasis in original).

Two years later the company again determined that a senior shop steward was not taking sufficient corrective action during an unlawful work stoppage and imposed a greater penalty on him than on the other participants. This action also was upheld on arbitration. See *id.*, at A–62, A–71.

Once in 1970 and again in 1973, the company imposed a more severe penalty on union officials who participated in an unlawful work stoppage. The officials were suspended for one and five days respectively, but the union chose not to take these cases to arbitration. See App. 29, 32.

continue his efforts to persuade the pickets to remove their line. After approximately four hours, Light and Lang were able to negotiate a settlement between the Operating Engineers and Metropolitan Edison. The settlement required the company to establish a separate entrance to the construction site. When this was done, the picket line came down and the union's members returned to work.

Metropolitan Edison disciplined all of its employees who refused to cross the picket line by imposing 5- to 10-day suspensions. Light and Lang, however, each received 25-day suspensions and were warned that future participation in any unlawful work stoppage would result in their immediate discharge. The company explained that the additional penalty was imposed because of their failure as union officials to make "every bona fide effort to prevent the unlawful work stoppage," specifically their failure to attempt to end the strike by crossing the picket line.[3]

The union filed an unfair labor practice charge, and the Regional Director for the National Labor Relations Board issued a complaint against the company. The Administrative Law Judge concluded that under *Precision Castings Co.*, 233 N. L. R. B. 183 (1977), selective discipline of union officials violated §§ 8(a)(1) and (3) of the National Labor Relations Act, 61 Stat. 140, as amended, 29 U. S. C. §§ 158(a)(1) and

---

[3] The company stated that the employees were being disciplined for "failure to report to work as scheduled and participation in an unlawful work stoppage." *Metropolitan Edison Co.*, 252 N. L. R. B. 1030, 1333 (1980). It specified that Light and Lang were being disciplined for the same reason but added:

"In addition, you are being disciplined for your failure as an elected official of Local Union 563 IBEW to demonstrate to the Company, in an objective manner, your affirmative duty as an elected officer to:

.        .        .        .        .

"(c) Make every effort, including returning to work yourself, to end the unlawful work stoppage.

*"Your participation in any unlawful work stoppage in the future will result in your immediate discharge." Ibid.* (emphasis in original).

(3).[4]  The Board affirmed the Administrative Law Judge's conclusions and findings.  *Metropolitan Edison Co.*, 252 N. L. R. B. 1030 (1980).

On petition for review and cross-petition for enforcement, the Court of Appeals for the Third Circuit enforced the Board's order.  663 F. 2d 478, 484 (1981).  It held that an employer may impose greater discipline on union officials only when the collective-bargaining agreement specifies that the officials have an affirmative duty to prevent illegal work stoppages.  *Id.*, at 482.  If the agreement does not provide for such a duty, any disparate treatment of union officials violates § 8(a)(3).  The court reasoned that in the absence of a clear contractual duty, requiring a union official to take affirmative steps to end an illegal work stoppage would place him in an intolerable position.  If he failed to follow the company's directions, he would place his job in jeopardy.  If he complied with the company's demands and crossed the picket line, he would lose the respect and support of the union members.  *Id.*, at 482–483.

The Court of Appeals rejected the company's argument that the two earlier arbitration awards were sufficient to impose a contractual duty on the union officials to cross the

---

[4] Sections 8(a)(1) and (3), as set forth in 29 U. S. C. §§ 158(a)(1) and (3), provide in relevant part:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

  .          .          .          .

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

Although §§ 8(a)(1) and (a)(3) are not coterminous, a violation of § 8(a)(3) constitutes a derivative violation of § 8(a)(1).  See *Indiana & Michigan Electric Co.* v. *NLRB*, 599 F. 2d 227, 229, n. 2 (CA7 1979); cf. R. Gorman, Basic Text on Labor Law 137 (1976).  Because the Board has not suggested that there is an independent violation of § 8(a)(1), we consider only the § 8(a)(3) charge.

picket line. The court held that it was not bound by these arbitration decisions in determining the extent of the officials' contractual obligations. *Id.*, at 483. It noted that a previous arbitration decision normally would not bind an arbitrator later construing the same collective-bargaining agreement. Absent an express contractual provision making earlier arbitration decisions binding,[5] the court declined to give these decisions any greater effect than an arbitrator would. *Id.*, at 483–484.

We granted certiorari to consider these recurring questions of federal labor law. 457 U. S. 1116 (1982). We now affirm.

## II

This case does not present the question whether an employer may impose stricter penalties on union officials who take a leadership role in an unlawful strike. The Administrative Law Judge found that neither Light nor Lang acted as a strike leader.[6] Nor does this case question the employer's right to discipline union officials who engage in unprotected activity. Neither the union nor the Board has argued that union officials who fail to honor a no-strike clause are immunized from being disciplined in the same manner as

---

[5] The bargaining agreement provided that arbitration decisions would be binding only for the term of the agreement. See 663 F. 2d 478, 484 (CA3 1981) (citing Article IX, § 9.2, ¶ 4, of the collective-bargaining agreement).

[6] The Board has held that employees who instigate or provide leadership for unprotected strikes may be subject to more severe discipline than other employees. See *Midwest Precision Castings Co.*, 244 N. L. R. B. 597, 598 (1979); *Chrysler Corp.*, 232 N. L. R. B. 466, 474 (1977). In making this factual determination the Board has recognized that a remark made by a union official may have greater significance than one made by a rank-and-file member. See *Midwest Precision Castings*, *supra*, at 599.

In this case the Board accepted the Administrative Law Judge's finding that Light and Lang were not strike leaders, and the Court of Appeals affirmed that finding. See 663 F. 2d, at 484. We note also that the disciplinary notices issued to both Light and Lang made clear that the additional penalties imposed on them were not based on any perceived leadership role in initiating or maintaining the strike. See n. 3, *supra*.

other strike participants. The narrow question presented is whether an employer unilaterally may define the actions a union official is required to take to enforce a no-strike clause and penalize him for his failure to comply.

Metropolitan Edison advances two arguments to justify the additional sanctions it imposed on Light and Lang. It contends first that its actions did not violate § 8(a)(3) because a union official has a duty to ensure compliance with the terms of the collective-bargaining agreement. Breach of this duty justifies the imposition of an additional penalty on union officials. Alternatively, the company contends that a union in effect may waive any statutory protection that otherwise would be accorded its officials by agreeing that they will undertake specific action to assure compliance with the no-strike clause. In this case, the arbitration awards and the union's acquiescence in the harsher sanctions imposed on its officials are sufficient to establish a clear contractual duty. We examine these arguments in turn.

### A

Section 8(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U. S. C. § 158(a)(3). By its terms, the statute requires proof that disparate treatment has been accorded union members and that the employer's action is likely to discourage participation in union activities. See *NLRB* v. *Brown,* 380 U. S. 278, 286 (1965). Congress, however, did not intend to make unlawful all acts that might have the effect of discouraging union membership. See *American Ship Building Co.* v. *NLRB,* 380 U. S. 300, 311 (1965). Rather, the intention was to forbid only those acts that are motivated by an anti-union animus. See, *e. g., NLRB* v. *Great Dane Trailers, Inc.,* 388 U. S. 26, 33 (1967); *NLRB* v. *Brown, supra,* at 286–287.

In determining whether Metropolitan Edison's conduct constitutes a § 8(a)(3) violation, we are guided by well-established precedent. Where there is direct evidence of an employer's antiunion motive, the Court has recognized that otherwise legitimate actions may constitute unfair labor practices.[7] See *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221, 227 (1963). Where, as here, there is only circumstantial evidence of intent to discriminate, identification of a § 8(a)(3) violation involves a more difficult inquiry. Intent must be inferred from conduct. But an employer may take actions in the course of a labor dispute that present a possible complex of motives, see *id.*, at 228, and it is often difficult to identify the true motive.

In these situations, the Court has divided an employer's conduct into two classes. See *NLRB* v. *Great Dane Trailers, Inc.*, 388 U. S., at 33–34. Some conduct is so " 'inherently destructive of employee interests' " that it carries with it a strong inference of impermissible motive. See *id.*, at 33 (quoting *NLRB* v. *Brown, supra*, at 287). In such a situation, even if an employer comes forward with a nondiscriminatory explanation for its actions, the Board "may nevertheless draw an inference of improper motive from the conduct itself and exercise its duty to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy." 388 U. S., at 33–34. On the other hand, if the adverse effect of the discriminatory conduct on employee rights is " 'comparatively slight,' an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the conduct." *Id.*, at 34 (emphasis in original). Congress

---

[7] This case does not present the issue of the proper allocation of burdens and order of proof in a "mixed motive" case, or in cases where an employee contends that an employer's otherwise legitimate act masks an impermissible purpose. See *NLRB* v. *Transportation Management Corp.*, 674 F. 2d 130 (CA1), cert. granted, 459 U. S. 1014 (1982).

has entrusted this determination in the first instance to the Board, see *NLRB* v. *Erie Resistor Corp.*, *supra*, at 236, and we turn now to its decisions.

B

The Board has found that disciplining union officials more severely than other employees for participating in an unlawful work stoppage "is contrary to the plain meaning of Section 8(a)(3) and would frustrate the policies of the Act if allowed to stand." *Precision Castings Co.*, 233 N. L. R. B., at 184.[8] This conduct, in the Board's view, is "inherently destructive" of protected individual rights because it discriminates solely on the basis of union status. See *Consolidation Coal Co.*, 263 N. L. R. B. 1306 (1982); *Indiana & Michigan Electric Co.*, 237 N. L. R. B. 226 (1978), enf. denied, 599 F. 2d 227 (CA7 1979). The Board has concluded that an employer's contractual right to be free of unauthorized strikes does not counterbalance the "discriminatory effects of singling out union officers for especially harsh treatment." *Consolidation Coal Co.*, 263 N. L. R. B., at 1309. Disciplining

---

[8] The Board's position on this question has not always been entirely clear. Some early Board opinions noted, as alternative rationales, that union officials have a greater duty than the rank and file to uphold a no-strike clause. Compare *University Overland Express, Inc.*, 129 N. L. R. B. 82, 92 (1960); *Stockham Pipe Fittings Co.*, 84 N. L. R. B. 629, (1949), with *Chrysler Corp.*, 232 N. L. R. B., at 475; *Pontiac Motors Division*, 132 N. L. R. B. 413, 415 (1961). See also Note, Discriminatory Discipline of Union Representatives for Breach of their "Higher Duty" in Illegal Strikes, 1982 Duke L. J. 900, 904–912 (reviewing Board's treatment of status-based responsibility). *Precision Castings* has eliminated any ambiguity, however, and the Board's position has been upheld by almost every Court of Appeals that has considered this question. See *NLRB* v. *South Central Bell Telephone Co.*, 688 F. 2d 345, 355 (CA5 1982); *Szewczuga* v. *NLRB*, 222 U. S. App. D. C. 336, 347, 686 F. 2d 962, 973 (1982); *C. H. Heist Corp.* v. *NLRB*, 657 F. 2d 178, 182–183 (CA7 1981) (distinguishing *Indiana & Michigan Electric Co.* v. *NLRB*, 599 F. 2d 227 (CA7 1979)). But cf. *NLRB* v. *Armour-Dial, Inc.*, 638 F. 2d 51, 55–56 (CA8 1981) (upholding harsher penalties only because officials "fomented" illegal work stoppage).

union officials discriminatorily may have only an indirect effect on the rank and file's decision to strike, but it may well deter qualified employees from seeking union office. See *ibid.*

We defer to the Board's conclusion that conduct such as Metropolitan Edison's adversely affects protected employee interests. Section 8(a)(3) not only proscribes discrimination that affects union membership, it also makes unlawful discrimination against employees who participate in concerted activities protected by § 7 of the Act. See *Radio Officers* v. *NLRB*, 347 U. S. 17, 39–40 (1954). Holding union office clearly falls within the activities protected by § 7, see *General Motors Corp.*, 218 N. L. R. B. 472, 477 (1975), and there can be little doubt that an employer's unilateral imposition of discipline on union officials inhibits qualified employees from holding office, see *Szewczuga* v. *NLRB*, 222 U. S. App. D. C. 336, 347, 686 F. 2d 962, 973 (1982).

Determining that such conduct adversely affects protected employee interests does not conclude the inquiry. If the employer comes forward with a legitimate explanation for its conduct, the Board must "strike the proper balance between the asserted business justifications and the invasion of employee rights." *NLRB* v. *Great Dane Trailers, Inc., supra,* at 33–34. In this case the company has argued that its actions were justified because there is an implied duty on the part of the union officials to uphold the terms of the collective-bargaining agreement. Unquestionably there is support for the proposition that union officials, as leaders of the rank and file, have a legal obligation to support the terms of the contract and to set a responsible example for their members. See *Indiana & Michigan Electric Co.* v. *NLRB*, 599 F. 2d, at 230–232. And in view of the disruptive effects of wildcat strikes, the importance of ensuring compliance with no-strike clauses is self-evident. See *Boys Markets, Inc.* v. *Retail Clerks*, 398 U. S. 235, 248–249, and n. 17 (1970); *Complete Auto Transit, Inc.* v. *Reis*, 451 U. S. 401, 418–419

(1981) (POWELL, J., concurring in part and concurring in judgment). But it does not follow that an employer may assume that a union official is required to attempt to enforce a no-strike clause by complying with the employer's directions and impose a penalty on the official for declining to comply. As the Board has concluded, the imposition of such a penalty would violate § 8(a)(3).

We think the Board's view is consistent with the policies served by the Act. "The entire process of collective bargaining is structured and regulated on the assumption that '[t]he parties . . . proceed from contrary and to an extent antagonistic viewpoints and concepts of self-interest.'" *General Building Contractors Assn.* v. *Pennsylvania,* 458 U. S. 375, 394 (1982) (quoting *NLRB* v. *Insurance Agents,* 361 U. S. 477, 488 (1960)). Congress has sought to ensure the integrity of this process by preventing both management and labor's representatives from being coerced in the performance of their official duties.[9] See *Florida Power & Light Co.* v. *Electrical Workers,* 417 U. S. 790, 810–811 (1974); *id.,* at 814 (WHITE, J., dissenting). Cf. 29 U. S. C. § 158(a)(2) (specifying employer domination of unions as an unfair labor practice). If, as the company urges, an employer could define unilaterally

---

[9] For example, when this Court upheld the Board's decision that foremen could constitute an appropriate unit for collective bargaining, see *Packard Motor Car Co.* v. *NLRB,* 330 U. S. 485 (1947), Congress responded by excluding supervisors from the coverage of the Act. See *NLRB* v. *Bell Aerospace Co.,* 416 U. S. 267, 279–284 (1974); 29 U. S. C. § 152(3). Congress was concerned that if supervisors were included in a bargaining unit, "'management will be deprived of the undivided loyalty of its foremen.'" *Florida Power & Light Co.* v. *Electrical Workers,* 417 U. S. 790, 809–810 (1974) (quoting S. Rep. No. 105, 80th Cong., 1st Sess., 5 (1947)). This concern was not limited to ensuring the loyalty of management's representatives. The House Report recognized that "no one, whether employer or employee need have as his agent one who is obligated to those on the other side, or one whom, for *any* reason, he does not trust." H. R. Rep. No. 245, 80th Cong., 1st Sess., 17 (1947) (emphasis in original); see also *id.,* at 14 (stating that management, "as well as workers, are entitled to loyal representatives in the plants").

the actions that a union official is required to take, it would give the employer considerable leverage over the manner in which the official performs his union duties. Failure to comply with the employer's directions would place the official's job in jeopardy. But compliance might cause him to take actions that would diminish the respect and authority necessary to perform his job as a union official. This is the dilemma Congress sought to avoid. We believe the Board's decision furthers these policies and uphold its determination.

### III

The company argues that even if § 8(a)(3) would prohibit it from imposing a more severe penalty on union officials than on other employees, the union in effect has waived the protection afforded by the statute. The substance of this contention is that, in this case, the prior arbitration awards and the union's acquiescence in the harsher sanctions imposed on its officials are sufficient to establish a corresponding contractual duty. We are met at the outset, however, by the union's response that the statutory right to be free from discrimination may never be waived. We examine first the union's argument.

### A

This Court long has recognized that a union may waive a member's statutorily protected rights, including "his right to strike during the contract term, and his right to refuse to cross a lawful picket line." *NLRB* v. *Allis-Chalmers Manufacturing Co.*, 388 U. S. 175, 180 (1967) (footnotes omitted). Such waivers are valid because they "rest on 'the premise of fair representation' and presuppose that the selection of the bargaining representative 'remains free.'" *NLRB* v. *Magnavox Co.*, 415 U. S. 322, 325 (1974) (quoting *Mastro Plastics Corp.* v. *NLRB*, 350 U. S. 270, 280 (1956)); cf. *NLRB* v. *Allis-Chalmers Manufacturing Co.*, *supra*, at 180–181. Waiver should not undermine these premises. Thus a union may bargain away its members' economic rights, but it may not surrender rights that impair the employees' choice of

their bargaining representative. See *NLRB* v. *Magnavox Co., supra,* at 325.

We think a union's decision to bind its officials to take affirmative steps to end an unlawful work stoppage is consistent with "the premise of fair representation." [10] Such a waiver imposes no constraints on the employees' ability to choose which union will represent them. Imposition of this duty is more closely related to the economic decision a union makes when it waives its members' right to strike. It merely requires union officials to take steps that are ancillary to the union's promise not to strike and provides the employer with an additional means of enforcing this promise.

The union argues that while a union may waive rights that are collective in nature, such as the right to strike, it may not waive individual rights, such as the right to hold union office. [11] In *Ford Motor Co.* v. *Huffman,* 345 U. S. 330 (1953),

---

[10] The Board's position on this question has not been consistent. Compare *Super Valu Xenia,* 228 N. L. R. B. 1254, 1259 (1977) (upholding discipline of union officials where collective-bargaining agreement expressly imposed higher duty on union officials), with *Gould Corp.,* 237 N. L. R. B. 881 (1978) (discharge of union steward not validated by contractually imposed duty), enf. denied, 612 F. 2d 728 (CA3 1979). Recently, in *Consolidation Coal Co.,* 263 N. L. R. B. 1306 (1982), two Board members held that a contractual duty will not justify the imposition of more severe sanctions on union officials. See *id.,* at 1310 (Members Fanning and Jenkins). Member Zimmerman would have allowed waiver where the duty was explicit. See *id.,* at 1311–1312. Two members would have found an affirmative duty even absent such waiver. See *id.,* at 1313 (Chairman Van de Water, dissenting); *id.,* at 1319 (Member Hunter, dissenting). To the extent *Consolidation Coal* provides any guidance as to the Board's present views, it suggests that a majority of the Board would find no statutory violation where the bargaining agreement imposes a specific duty on union officials. The Courts of Appeals that have considered this question have agreed that this statutory protection may be waived. See, *e. g., NLRB* v. *South Central Bell Telephone Co.,* 688 F. 2d, at 356; *Fournelle* v. *NLRB,* 216 U. S. App. D. C. 173, 182–183, 670 F. 2d 331, 340–341 (1982); *Gould, Inc.* v. *NLRB,* 612 F. 2d 728, 733 (CA3 1979), cert. denied, 449 U. S. 890 (1980); *C. H. Heist Corp.* v. *NLRB,* 657 F. 2d, at 183.

[11] The union contends that *Alexander* v. *Gardner-Denver Co.,* 415 U. S. 36, 51 (1974), demonstrates that the individual right not to be discrimi-

however, the Court recognized that in securing the good of the entire bargaining unit, some differences in the treatment of individual union members might occur:

> "Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." *Id.*, at 338.

No-strike provisions, central to national labor policy, often have proved difficult to enforce. See *Boys Markets, Inc.* v. *Retail Clerks*, 398 U. S., at 248–249, and n. 17; *Complete Auto Transit, Inc.* v. *Reis*, 451 U. S., at 423–424 (POWELL, J., concurring in part and concurring in judgment). A union and an employer reasonably could choose to secure the integrity of a no-strike clause by requiring union officials to take affirmative steps to end unlawful work stoppages. Indeed, a union could choose to bargain away this statutory protection to secure gains it considers of more value to its members. Its decision to undertake such contractual obligations promotes labor peace and clearly falls within the range of reasonableness accorded bargaining representatives.

### B

We consider finally whether the union waived its officials' rights. In *Mastro Plastics Corp.*, *supra*, the question was whether a general no-strike provision waived the specific right to strike over an unfair labor practice. While reserv-

---

nated against may never be waived. In *Gardner-Denver*, however, we noted that waiver would be inconsistent with the purposes of the statute at issue there. As discussed above, the National Labor Relations Act contemplates that individual rights may be waived by the union so long as the union does not breach its duty of good-faith representation.

ing the question whether a union might waive this right if it were "explicitly stated," the Court determined that "there is no adequate basis for implying [the] existence [of waiver] without a more compelling expression of it than appears in . . . this contract." 350 U. S., at 283. Thus, we will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is "explicitly stated." More succinctly, the waiver must be clear and unmistakable.[12]

In this case, Metropolitan Edison does not contend that the general no-strike clause included in the bargaining agreement imposed any explicit duty on the union officials. Rather it argues that the union's failure to change the relevant contractual language in the face of two prior arbitration decisions constitutes an implicit contractual waiver. Not to give these decisions any effect, the company argues, would impair the effectiveness of the dispute resolution process for which the parties bargained.

We agree that the grievance-arbitration procedure forms an integral part of the collective-bargaining process. See *Clayton* v. *Automobile Workers*, 451 U. S. 679, 686–687 (1981); *Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574, 578 (1960). And we do not doubt that prior ar-

---

[12] The Courts of Appeals have agreed that the waiver of a protected right must be expressed clearly and unmistakably. See, *e. g.*, *Chesapeake & Potomac Telephone Co.* v. *NLRB*, 687 F. 2d 633, 636 (CA2 1982); *NLRB* v. *Southern California Edison Co.*, 646 F. 2d 1352, 1364 (CA9 1981); *Communication Workers of America, Local 1051* v. *NLRB*, 644 F. 2d 923, 927 (CA1 1981). The holding in *Teamsters* v. *Lucas Flour Co.*, 369 U. S. 95 (1962), is not to the contrary. There the Court found that a contract provision establishing that a dispute shall be settled exclusively and finally by compulsory arbitration makes clear that the union may not strike over such a dispute. See *id.*, at 105. *Lucas Flour* established that there does not have to be an express waiver of statutory rights, but waiver was implied in that situation only because of the unique conjunction between arbitration and no-strike clauses. Cf. *Gateway Coal Co.* v. *Mine Workers*, 414 U. S. 368, 382 (1974).

bitration decisions may be relevant—both to other arbitrators and to the Board—in interpreting bargaining agreements.[13]   But to waive a statutory right the duty must be established clearly and unmistakably.   Where prior arbitration decisions have been inconsistent, sporadic, or ambiguous, there would be little basis for determining that the parties intended to incorporate them in subsequent agreements. Assessing the clarity with which a party's duties have been defined of course will require consideration of the specific circumstances of each case.   Cf. *Carbon Fuel Co.* v. *Mine Workers,* 444 U. S. 212, 221–222 (1979).

As noted above, the company argues that when the prior bargaining agreement was renegotiated, the union's silence manifested a clear acceptance of the earlier arbitration decisions.   During the history of collective bargaining between these two parties, however, there were only two arbitration decisions that imposed a higher duty on union officials.   We do not think that two arbitration awards establish a pattern of decisions clear enough to convert the union's silence into binding waiver.   This is especially so in light of the provision in the bargaining agreement that "[a] decision [by an arbitrator] shall be binding . . . for the term of *this* agreement." See n. 5, *supra* (emphasis added).   We conclude that there is

---

[13] An arbitration decision may be relevant to establishing waiver of this statutory right when the arbitrator has stated that the bargaining agreement itself clearly and unmistakably imposes an explicit duty on union officials to end unlawful work stoppages.   Absent such a statement, the arbitration decision would not demonstrate that the union specifically intended to waive the statutory protection otherwise afforded its officials. In this case, however, the two arbitration decisions did not purport to determine the parties' specific intent.

Even if the arbitration decisions do not state that there is a specific and explicit duty, they still may be relevant in determining the parties' intent. Where there is a clear and consistent pattern of arbitration decisions the parties, in some circumstances, may be said to have incorporated the decisions into their subsequent bargaining agreements.   Cf. *Carbon Fuel Co.* v. *Mine Workers,* 444 U. S. 212, 221–222 (1979).

no showing that the parties intended to incorporate the two prior arbitration decisions into the subsequent agreement.

## IV

We accept the Board's conclusion that the imposition of more severe sanctions on union officials for participating in an unlawful work stoppage violates § 8(a)(3). While a union may waive this protection by clearly imposing contractual duties on its officials to ensure the integrity of no-strike clauses, we find that no waiver occurred here. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*