UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, LOCAL UNION NO. 747, Appellant/Cross-Appellee,

v.

STONE & WEBSTER ENGINEERING CORPORATION, and Walsh Construction Company, a Division of Guy F. Atkinson Co., Appellees,

and

Walsh Construction Company, a Division of Guy F. Atkinson Company, Appellee/Cross-Appellant.

Nos. 346, 411, Dockets 86–7604, 86–7650.

United States Court of Appeals, Second Circuit.

Argued Nov. 6, 1986.

Decided Dec. 22, 1986.

James R. LaVaute, Syracuse, N.Y. (Donald D. Oliver, Blitman and King, Syracuse, N.Y., of counsel), for appellant/cross-appellee.

Brian M. Cole, Syracuse, N.Y. (Bryant, O'Dell & Basso, Syracuse, N.Y., of counsel), for appellee Stone & Webster Engineering Corp.

Thomas J. Grooms, Syracuse, N.Y. (John Gaal, Bond, Schoeneck & King, Syracuse, N.Y., of counsel), for appellee/cross-appellant Walsh Const. Co.

Before LUMBARD, OAKES and KEARSE, Circuit Judges.

OAKES, Circuit Judge:

This appeal from a summary judgment by the United States District Court for the Northern District of New York, Howard G. Munson, Chief Judge, raises questions pertaining to the construction and predominance of the national and local collective bargaining agreements for carpenters employed at the Nine Mile Two nuclear power plant near Oswego, New York. The court held below that while Walsh Construction Company ("Walsh") and Stone & Webster Engineering Corporation ("Stone & Webster") were bound to local agreements with United Brotherhood of Carpenters and Joiners of America, Local Union No. 747 ("Local 747"), the terms of the 1983 national agreement between the United Brotherhood of Carpenters and Joiners ("the International") and the National Constructors Association ("NCA") superseded the local agreement in regard to shift differential and overtime pay rates for the carpenters. Local 747 appeals and Walsh files a limited cross-appeal on the ground that it was not bound to any local agreement in any event. We affirm on both the appeal and cross-appeal.

Construction of the Nine Mile Two nuclear plant started in 1975. In February 1976 Stone & Webster began to hire carpenters for work on the project. At that time Stone & Webster was signatory to a national agreement dated July 6, 1960, with the International. That agreement provided that signatory contractors were obligated to observe and comply with the terms and conditions of the local collective bargaining agreement in the locality in which the work was being performed. Thus, by this provision of the 1960 national agreement Stone & Webster was bound to observe the local collective bargaining agreement between the Adirondack & Vicinity District Council of Carpenters, of which appellant Local 747 was a constituent local, and the Oswego Building Trades Employers Association.

Walsh began construction at Nine Mile Two during May 1976. At that time it was signatory to a 1968 national agreement with the International under which it was also obligated to observe local collective bargaining agreements. Thus, it too was bound to observe the agreement between the Adirondack & Vicinity District Council of Carpenters and the Oswego Building Trades Employers Association.

In 1977, Walsh executed a second national agreement with the International that merely continued the terms of the earlier national agreement obliging Walsh to look to the wages, including shift and overtime pay, established in the local agreement. On November 1, 1981, however, the International and the NCA entered into a third national agreement containing specific provisions governing shifts and overtime for projects under its coverage that were commenced after November 1, 1981. Walsh, then a member of the NCA, signed on to this agreement in January 1982. Because construction at Nine Mile Two clearly predated November 1, 1981, Walsh was still obligated to look to the local agreement and did so.

In June 1982, Stone & Webster likewise signed the November 1, 1981, national agreement, and it too continued to follow the local contract in respect to wage rates including shift differential and overtime pay. Article 17 of the 1981 national agreement provided for subordination of the local contract to the national agreement "[e]xcept as otherwise provided in this Agreement." And Article 9 of the 1981 national agreement provided that the employer will conform to a local contract "subject to the provisions of this Agreement" and also that after an employer's operation commences changes in wages or working conditions require agreement between the local union and local contractors.

On November 1, 1983, however, the November 1, 1981, national agreement was amended, including revisions of Articles 10 and 19 that were to be effective November 1, 1983. Article 10 of the amended national agreement sets forth employers' specific obligations with respect to hours of work, overtime, shifts, and holidays. Article 19 of the amended agreement provides that "[t]his Agreement shall be effective on No-

vember 1, 1983 on all projects covered by this Agreement," except projects with less than six months of construction work remaining to be performed. On November 23, 1983, both Stone & Webster and Walsh became signatories to the amended national agreement. In January 1984 both also began implementing the new overtime and shift pay rates at the Nine Mile Two project as provided in Article 10 of the amended national agreement. There is no dispute that since then both have complied with the rate structure as set forth in Article 10.

In April 1984, Local 747 commenced this action alleging that Stone & Webster's and Walsh's implementation of the rates contained in the national agreement constituted a breach of the local agreement. Both the contractors and Local 747 moved for summary judgment. Finding no dispute as to the material facts (although there is a dispute as to the applicability of the local agreement to Walsh), the court granted summary judgment on the ground that the terms of the national agreement prevail.

### Discussion

Local 747 essentially argues that both Stone & Webster and Walsh were bound to the local area agreement and that the amended national agreement does not apply to work at Nine Mile Two. It is true that both employers agreed to work the hours, pay the wages, and observe the working conditions set forth in the local area collective bargaining agreement even though they did so by virtue of the terms of the national agreement then in effect. Local 747 suggests that they never terminated the local area agreement or their agreements to abide by the local agreement. However, we agree with the employers that they were never bound by the local agreements solely by virtue of signing the national agreement. They were bound only to the national agreement which derivatively incorporated local wages and benefits as established by local contracts. The employers and the national union therefore were free to amend the agreement between themselves as they saw fit, including removing the reference to local wages and conditions and replacing it with specific provisions governing shift and overtime pay for all projects under its coverage.

Article 17 of the amended national agreement provides that "[e]xcept as otherwise provided in this Agreement, any provisions of a local or area collective bargaining agreement which may be in conflict with the provisions contained herein shall be considered subordinate to this Agreement." Local 747 relies on the first clause in Article 17 to argue that it is in fact "otherwise provided in this Agreement" that the terms of the local agreement will govern. Specifically, Local 747 relies on the reference in Article 9 that "[a]fter the Employer's operation has commenced ... no subsequent change in wages or working conditions ... will become effective ..., except to the extent that any such change ... shall have been agreed upon ... in negotiations between the local union ... and [the local] contractors...." However, the previous paragraph in Article 9 provides that the employer will conform to a local collective bargaining agreement "subject to the provisions of the Agreement." Local 747 reads this to mean "subject to the provisions of the *local* agreement." In responding to this contention, Walsh goes so far as to misquote the previous paragraph in Article 9 by inserting the word "National" before the word "Agreement." While this misquotation or insertion may be a matter of wishful thinking on Walsh's part, we see it as what the parties to the national agreement intended: the word "Agreement" in the Article 9 clause in question is capitalized and is not preceded by the word "local," which the parties well knew how to spell out when they wanted to refer to the local agreement.[1] For example, Article 10 itself says that "[h]olidays shall be recog-

---

1. It is true that in a number of other places the 1983 amended national agreement refers to "*this* Agreement" (emphasis supplied) rather than "the Agreement", but we think this is immaterial.

nized in accordance with the applicable local agreement" and that "[r]eporting pay for other than weather conditions shall be as established in the appropriate local agreement." No part of the phrase "local agreement" is capitalized anywhere in the 1983 Agreement. Moreover, the construction of Article 9 that Local 747 suggests would not only render superfluous Article 10, which spells out the national rules governing shifts and overtime, it would also make Article 17 of the national agreement meaningless insofar as it indicates that conflicts between local and national agreements should be resolved in favor of the national agreement.

Alternatively, Local 747 argues that the employers' continued acceptance of the local agreement estops them from denying its binding effect. But here, unlike in *NLRB v. Haberman Construction Co.*, 641 F.2d 351, 355–56 (5th Cir.1981) (en banc), there was in effect a contract expressly defining the employers' duties under the local agreement. Throughout the employers' dealings with Local 747 their correspondence emphasized the primacy of the national agreement and the derivative nature of their obligations under the local agreement. Letters from Walsh, for example, to the Adirondack & Vicinity District Council of Carpenters dated June 29, 1978, and to Local 747 on June 6, 1980, both point out that Walsh is a signatory to the national agreement, one of the provisions of which is that Walsh will conform to the working conditions and payments negotiated under the applicable local agreement. It is true that there were certain shift pay agreements made directly between Walsh and Local 747 that made no mention of the national agreement, and the same holds true with respect to Stone & Webster. But these agreements and letters were written pursuant to the 1981 national agreement, which allowed local shift agreements and which had not yet been amended to adopt the overriding shift and overtime provisions of Article 10 that were added in the 1983 amendments.

Local 747's argument that Stone & Webster is bound by the local agreement as a party to it is also unavailing because, even assuming that Stone & Webster was a party to the local agreement, that agreement was superseded by the national agreement. *See Blake Construction Co. v. Laborers' International Union*, 511 F.2d 324, 328–30 (D.C.Cir.1975) (national short-form agreement is binding on union local).

Local 747 next argues that allowing the national agreement to supersede the local agreement violates national labor policies in favor of maintaining stable bargaining relationships and against waiver of a union's rights absent "clear and unmistakable evidence of such waiver," citing *NLRB v. Financial Institution Employees of America, Local 1182*, — U.S. —, 106 S.Ct. 1007, 1016, 89 L.Ed.2d 151 (1986) (NLRA intended to encourage stable bargaining relationships), and *Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 511 (5th Cir.1982) (same), *cert. denied*, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983), as well as *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 709, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983) (union's waiver of a statutory right must "be established clearly and unmistakably"), and *Road Sprinkler Fitters Local Union 669 v. NLRB*, 676 F.2d 826, 833 (D.C.Cir.1982) (same). But this argument overlooks the need to ensure and protect stability in the bargaining relationship between Walsh or Stone & Webster and the international union. As the D.C. Circuit said in *Blake Construction Co. v. Laborers' International Union*, 511 F.2d at 329:

> It would be anomalous to permit local units to enjoy the benefits of bargaining agreements and yet to rid themselves of the duties concomitantly imposed simply because the agreements are signed only by the parent unions.

As to the second policy argument, we do not know what right it is that Local 747 claims is implicated and cannot be waived, but whatever right it is, Article 17 of the national agreement, as amended, does clearly make the national agreement supersede the earlier local agreement. Here, the

later national agreement prevails over the earlier local one, just as in *Bechtel Corp. v. Laborers' Local 215*, 544 F.2d 1207 (3d Cir.1976), where an employer was concededly a party to both a national agreement with an international union and a local agreement with a local union and each agreement proclaimed the superiority of its terms.

Local 747 makes two additional arguments. The first is that the 1981 national agreement, as amended in 1983, does not apply to the Nine Mile Two project. It also points to the fact that neither employer attempted to apply the November 1, 1983, amended agreement until January 1984. But the fact that the employers delayed in implementing Article 10's shift and overtime provisions in no way undercuts their applicability. And, while prior to 1983 the national agreements were not applicable to the Nine Mile Two project by their terms, they were made applicable to the project by the 1983 amendments.

Finally, Local 747 argues that the local agreement is binding on Walsh because Walsh, which was admittedly a signatory of the 1983 amended national agreement, had allowed its membership in the NCA to terminate on December 31, 1982. This argument is beside the point since Walsh signed on to the amended agreement as of November 23, 1983. An employer may be bound to a national agreement automatically by being a member of the negotiating employers' association, as is the case with Stone & Webster, a member of the NCA. Or it may be bound specifically by signing an agreement directly with the international union as an individual signatory to the national agreement, as is the case with Walsh. The correspondence between Walsh and the International demonstrates this insofar as it reflects Walsh's application to the International to be a party to the 1983 amended national agreement on an individual basis, an application that was explicitly endorsed by the International. The fact that the preamble of the national agreement indicates that it is between the International and the NCA "on behalf of the members signatory hereto who are hereinafter called the 'Employer,'" is immaterial since the International's acceptance of Walsh's request to be continued as an individual signatory is to be given legal effect. In addition, the fact that Article 19 requires the "mutual consent" of the NCA for modification of the national agreement does not restrict the International's freedom to negotiate the same terms of the agreement with any other employer.

On cross-appeal, Walsh challenges the district court's statements that Walsh became bound to the local agreement by signing the short-form national agreements and that the Oswego Building Trades Employers Association was Walsh's "recognized agency of the locality." Walsh's objections to the court's wording are unavailing, however, because Walsh was "bound" to follow the local agreement by the terms of the national agreements and because the Employers Association was the recognized agency under the national agreement whether or not it was Walsh's "recognized agency."

Judgment affirmed.