UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 06-1204

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

versus

LEADING EDGE AVIATION SERVICES, INCORPORATED,

Respondent.

On Application for Enforcement of an Order of the National Labor
Relations Board.  (11-CA-19783)

Argued:  October 26, 2006          Decided:  January 9, 2007

Before TRAXLER, GREGORY, and SHEDD, Circuit Judges.

Petition granted by unpublished opinion. Judge Gregory wrote the
opinion, in which Judge Traxler and Judge Shedd concurred.

**ARGUED:** Melvin Hutson, Greenville, South Carolina, for Respondent.
Jeffrey Lawrence Horowitz, NATIONAL LABOR RELATIONS BOARD, Office
of the General Counsel, Washington, D.C., for Petitioner.  **ON
BRIEF:** Ronald Meisburg, General Counsel, John E. Higgins, Jr.,
Deputy General Counsel, John H. Ferguson, Associate General
Counsel, Aileen A. Armstrong, Deputy Associate General Counsel,
David Habenstreit, Supervisory Attorney, NATIONAL LABOR RELATIONS
BOARD, Office of the General Counsel, Washington, D.C., for
Petitioner.

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

The National Labor Relations Board ("NLRB" or "Board") brings this action to enforce a Board order against Leading Edge Aviation Services ("Leading Edge") for its refusal to hire based on prior protected union activity and for retaliation against a participant in an NLRB unfair labor practices proceeding. Because substantial evidence supports the Board's conclusion that Leading Edge engaged in unfair labor practices in violation of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1), (3), and (4) (2004), we affirm the ruling of the Board and grant the petition for enforcement.

I.

From 1989 to 2001, Terry Host worked for Lockheed Martin Aircraft Center ("Lockheed") in Greenville, South Carolina. He spent the last six years of his tenure as a quality control inspector ("QCI"). In 1998 and 1999, Host served as the president of a committee to organize a Lockheed local of the Aircraft Mechanics Fraternal Association. Host was active and well known for his efforts; he wore his red union shirt at all times during the drive and received mention in the Greenville newspaper. In the summer of 1999, after the union drive failed, Host's manager, Joe Janas, disciplined Host for continuing to wear his union shirt and threatened him with termination. Host filed an unfair labor

2

practices claim with the NLRB against Lockheed. Administrative Law Judge ("ALJ") William N. Cates found that Lockheed, through Janas, had used unfair labor practices against Host. The ALJ ordered Lockheed to remove the warnings against Host from its files, to notify Host that it had done so, and to post a notice of its violations and its employees' rights. Two years later, Host voluntarily resigned from Lockheed to take a position at General Electric ("GE"), which offered better pay and benefits.

Leading Edge has worked exclusively as a subcontractor for Lockheed for fourteen years. Its facilities are entirely contained within the Lockheed complex at the Donaldson Center in Greenville. Leading Edge's primary business is to strip and refurbish airplanes and airplane fuel tanks. It performs the bulk of this work on the P-3, a four-engine turbo prop aircraft.

In October 2002, Leading Edge decided to hire two new QCIs, one to replace Harry Gaskin, the current QCI, who was receiving a promotion, and one to work on a second shift the company was starting to accommodate its increasing workload. Because GE had been laying off workers, Host sent his resume to Leading Edge on October 31, 2002. Craig Arnold, Leading Edge's Director of Military Programs, immediately called Host and asked him to come to the complex for an interview that day. During the interview, Arnold asked Host about his prior experience as a QCI on the P-3, his comfort-level with completing paperwork and training employees,

and his willingness to work on the second shift. Host responded positively to all of these questions and said that he would be comfortable with the $18 hourly wage Leading Edge offered.[1] Arnold told Host that he would need to take a drug test and speak with the current QCI, Gaskin. After taking a tour of the facility and recognizing several of his former Lockheed colleagues, including Rich Parker, Host left Leading Edge with the impression that he would be hired if he passed the drug test and spoke with Gaskin.

Arnold made several notations at the top of Host's application sheet. He wrote that Host was "Okay our second shift," which, he later explained, meant that he considered Host suitable for the second-shift QCI position. He also noted that he should check with Parker and Janas, managers at Lockheed who had known Host. J.A. 57, 60, 271. Arnold testified that he checked with Parker and Janas, and they told him that Host had been a "tough inspector" or a "good inspector." J.A. 57-60.

The next day, November 1, Arnold telephoned Host to tell him that he was bringing in two men to fill the QCI jobs. He reassured Host that he was the third choice. Host testified that he was confused about this change, so he called the three references he had listed on his resume—Ken Crowe, Ken Buffington, and Don

---

[1]Host had worked with the P-3 while at Lockheed and had received favorable reviews and several awards for his inspection work.

4

Gary—and discovered that no one from Leading Edge had contacted them.

Host testified that on November 4 or 5, having heard nothing from Leading Edge, he called Arnold again to ask why he had not been hired. Arnold initially told him that he was still the third choice. Host then confronted Arnold and asked him if he had spoken to Parker. Arnold replied that he had but that the conversation had no bearing on his hiring decision. Host described the rest of the conversation as follows:

> And at that point I just told him frankly, I said, "Let's cut the B.S. . . . You know you can be honest with me about what was said. . . . I went from being hired—or, excuse me, to all I need to do is tak[e] a drug test one day, then I'm the third choice, and, you know, I'd like the truth." And he said that whatever Rich and him had talked about, once again, had no bearing on it, but Rich had told him that I was a good worker but I'd had some trouble in the past.

J.A. 94-95. Host testified that he told Arnold he had left Lockheed voluntarily but he had "been involved in a Union related matter and Lockheed was found guilty on five of the six charges that they went to Court on against me." J.A. 95. According to Host, Arnold then told him that he would not be hiring Host at that time or at any time in the future. Arnold denied before the ALJ that Parker or Janas had mentioned any of Host's trouble with Lockheed, but he admitted that "days later" some of the other Lockheed workers told him Host "had some trouble" there. J.A. 158-

5

59. Arnold maintained, however, that he did not learn of Host's NLRB claim against Lockheed until two weeks before the trial.

Arnold testified that he decided not to hire Host for the first shift QCI position because Host lacked the interpersonal skills necessary for a QCI who had to communicate with the customer, i.e., Lockheed. Arnold emphasized that "the communications skills are important in being able to tell the customer he's wrong." J.A. 143. The job, he testified, "requires the ability to be able to communicate verbally and in written form carefully and accurately." J.A. 144. Arnold testified that Host failed as a candidate in these areas:

> I had some concerns over his communication skills. His verbal communication skills were relatively good. His written communication skills possibly seemed lacking, but I wasn't sure. However, in general, his inter-personal skills I felt as though he would be better suited for the second shift; there would be less requirement for him to interface with the Lockheed mid-level, senior level management; and that his technical skills could be used to the best of their advantage.

J.A. 149. Arnold admitted on cross-examination that he had not asked Host for a writing sample, nor had he seen any of Host's writing or discussed his writing ability with anyone. Finally, Arnold testified that although he felt Host was qualified for the second-shift QCI position, the position never materialized because Lockheed sent Leading Edge fewer airplanes, eliminating the need for a second shift.

After Host's interview with Arnold, Jeffrey Meyer, another GE employee and former QCI at Lockheed, sent his resume to Leading Edge. Meyer had spoken with Host about the QCI openings, and Host seemed confident in his own prospects. Meyer interviewed with Arnold during the first week of November. Arnold told Meyer that they were implementing a second shift and wanted a QCI for that shift and a replacement QCI for the first shift. Arnold and Meyer discussed the requirements of the job and the starting salary, and Gaskin gave Meyer a tour of the facility. Meyer testified that Arnold told him that Leading Edge "was getting ready to spool up [the second shift] that week, and that if he got the job, he would be training under Gaskin on the first shift until he was ready to handle the second shift by himself." J.A. 43-44. On November 6, Arnold called Meyer and offered him a QCI position. Meyer asked for a day to consider the offer. During that day, Meyer received another job offer from the Greenville Airport. Deciding to take the airport job, Meyer called Arnold to express his regrets and refuse the job offer. Arnold asked Meyer if he could recommend anyone else for the job, and Meyer named Carlos Hoyos and Randy Herman.

In his testimony before the ALJ, Arnold denied that he had offered Meyer a position as a QCI. Arnold stated that it was Leading Edge's policy to make job offers in writing. Meyer admitted on cross-examination that he never received a written job

7

offer from Leading Edge, but Leading Edge offered no evidence beyond Arnold's testimony that it only extended job offers in writing.

Arnold admitted in his testimony that Leading Edge started a second shift in November 2002. He also admitted that he hired Hoyos as a QCI between November 14 and 18. He said that he hired Hoyos above Host because Hoyos had excellent communication skills, seemed "very receptive to change," and "had a very professional demeanor and presentation about him." J.A. 154-55.

Host filed an unfair labor practices charge against Leading Edge on December 12, 2002. He accused Leading Edge of violating 29 U.S.C. §§ 158(a)(1), (3), and (4) by refusing to hire him because of his past union activity and NLRB action against Lockheed. On May 22, 2003, ALJ Margaret G. Brakebusch found that Leading Edge had violated the Act by refusing to hire Host for a QCI position. Basing her decision on the Wright Line test, she stated that the NLRB had carried its burden on the prima facie case and that Leading Edge had not proven that it had legitimate, non-discriminatory reasons for refusing to hire Host.

The ALJ credited the testimony of Meyer and Host but did not believe Arnold's stated reasons for his refusal to hire Host. She found Arnold's justification that Host lacked good written and verbal communication skills to be pretextual. She discredited his testimony about his conversations with the Lockheed managers:

8

> I find it incredible that Janas simply verified Host's employment and described Host as a good inspector without mentioning Host's Union or protected activities. It is implausible that Janas would have failed to mention that Host filed a charge against Lockheed and testified against the company in the unfair labor practice proceeding. As a result of Host's testimony, Judge Cates found Janas's actions violative of the Act. . . .
>
> [I]t would be naive to assume that a Lockheed manager named in the judge's decision would have a casual response to any inquiry about Host.

J.A. 300. The ALJ also did not believe that Arnold had not known about the Lockheed case until just before his own hearing.

The ALJ concluded that Leading Edge had a second shift position available (because they had offered it to Meyer), that Host was qualified for the position, and that Leading Edge's reasons for not hiring Host gave rise to an inference of animus and discriminatory motive. She ordered Leading Edge to cease and desist from its unfair labor practices and to post the required notice informing its employees of its wrongs and their rights. She also ordered Leading Edge to offer Host a job and pay his lost wages and benefits.

On September 29, 2005, the Board affirmed in large part Judge Brakebusch's ruling. The Board agreed that Leading Edge had violated the Act by refusing to hire Host for the second-shift QCI position and that Leading Edge's reason for refusing to hire Host was pretextual. The Board pointed out that Leading Edge had started a second shift in November and that it was hiring for the QCI position when it considered Host and offered the job to Meyer.

9

Concluding that Leading Edge had thus not rebutted the NLRB's prima facie case, the Board upheld the remedies the ALJ had ordered.

The NLRB brings this action before us for enforcement of the Board's order.

II.

We will enforce an NLRB order under the National Labor Relations Act if "substantial evidence on the record considered as a whole" supports the ALJ's factual findings and if she applied the law to the facts in a manner both "reasonable and consistent with the act." 29 U.S.C. § 160(e); Grinnell Fire Protection Sys. Co. v. NLRB, 236 F.3d 187, 195 (4th Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Diesel Co. v. NLRB, 263 F.3d 345, 351 (4th Cir. 2001) (citations and quotation marks omitted). We must "accord due deference to the reasonable inferences that the Board draws from the evidence." Grinnell, 236 F.3d at 195. If substantial evidence exists to support an NLRB decision, then we "must uphold the Board's decision even though we might have reached a different result had we heard the evidence in the first instance." Consol. Diesel, 263 F.3d at 351.

In determining whether substantial evidence exists, we defer to the credibility findings of the ALJ unless faced with "extraordinary circumstances." NLRB v. Transpersonnel, Inc., 349

10

F.3d 175, 184 (4th Cir. 2003). The ALJ is in the best position to judge the credibility of the witnesses who appear before her: "The balancing of witnesses' testimony is at the heart of the factfinding process, and it is normally not the role of the reviewing court to second-guess a fact-finder's determinations about who appeared more 'truthful' or 'credible.'" Fieldcrest Cannon, Inc. v. NLRB, 97 F.3d 65, 71 (4th Cir. 1996). Extraordinary circumstances sufficient to overturn an ALJ's credibility determination exist in "those instances when 'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.' " Sam's Club v. NLRB, 173 F.3d 233, 240 (4th Cir. 1999) (quoting NLRB v. CWI of Md., Inc., 127 F.3d 319, 326 (4th Cir. 1997)).

## III.

The National Labor Relations Act protects employees who seek to form unions or participate in union activities. Section 8 of the Act protects the union rights of employees by making it an unfair labor practice for an employer:

> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; . . .
>
> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ;

11

> (4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter.

29 U.S.C. § 158 (2004). The NLRB has enforcement jurisdiction for these sections of the Act. 29 U.S.C. § 160.

To succeed on a refusal to hire claim under Section 8,[2] the applicant must prove that the employer refused to hire him or her "for the purpose of discouraging union activity." Ultrasystems W. Constructors, Inc. v. NLRB, 18 F.3d 251, 256 (4th Cir. 1994). The NLRB, on behalf of the applicant, must show:

> (1) that the employer is covered by the Act;
> (2) that the employer at the time of the purportedly illegal conduct was hiring or had concrete plans to hire employees;
> (3) that anti-union animus contributed to the decision not to consider, interview, or hire an applicant; and
> (4) that the applicant was a bona fide applicant.

Id. The employer's motive for refusing to hire the applicant is the key element in these cases.

Because proving discriminatory motivation is a difficult task, the Supreme Court has approved a burden-shifting proof process known as the Wright Line test for mixed-motive cases. See NLRB v. Transp. Mgmt. Corp, 462 U.S. 393, 403 (1993) (approving the burden-shifting scheme of Wright Line, 251 N.R.L.B. 1083 (1980)). To make a prima facie case of discriminatory refusal to hire, the NLRB must

---

[2]Proving that an employer violated Section 8(a)(3) also proves a derivative violation of Section 8(a)(1). Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 698 n.4 (1983).

12

prove by a preponderance of the evidence "that a discriminatory motive was a substantial motivating factor" in the employer's refusal to hire the applicant. RCG (USA) Mineral Sands, Inc. v. NLRB, 281 F.3d 442. 448 (4th Cir. 2002) (citing CWI, 127 F.3d at 331)). The burden then shifts to the employer "to prove affirmatively that the same action would have been taken even in absence of the [applicant's] union activity." Id. (citing FPC Holdings, Inc. v. NLRB, 64 F.3d 935, 942 (4th Cir. 1995)). The ALJ should scrutinize the reasons given by the employer, and "[i]f the [judge] believes the employer's stated lawful reasons are non-existent or pretextual, the defense fails." USF Red Star, Inc. v. NLRB, 230 F.3d 102, 106 (4th Cir. 2000).

In considering whether the employer violated Section 8(a)(4) of the Act, the ALJ should also use the Wright Line test to determine whether the employer's decision not to hire was based in part on the applicant's having filed unfair labor practice charges in the past.

IV.

The Board determined that Leading Edge's decision not to hire Terry Host was substantially motivated by animus against his union activities at Lockheed. Neither party disputes that Leading Edge is an employer covered under the Act, and Leading Edge has conceded

13

that Terry Host was qualified for the QCI position.[3]  With these elements met, we now examine whether substantial evidence supports the conclusions that Leading Edge had a position available when it denied Host the job and that anti-union animus motivated its decision not to hire Host.

A.

Leading Edge claims that it did not violate the Act because the company never started its second shift and therefore never had a second-shift QCI position to offer to Host.  In support of this argument, Leading Edge states that it experienced a slow down in work that prevented the implementation of its second shift, that it never made Meyer an official offer for the second-shift position, and that it hired Hoyos for the first-shift position.  During the hearing before the ALJ, Leading Edge offered documents to show that Lockheed had indeed sent them fewer airplanes to refurbish from January through July 2003 and that it had to reduce its workforce from fifty-six employees to thirty-four employees between February and April 2003.

Despite Leading Edge's arguments, substantial evidence supports the ALJ and Board's conclusions that at the time it was

---

[3]Arnold testified that Host "had good experience as an inspector; was very strong in technical skills, in other words the physical inspection part of the job."  J.A. 146.  According to Arnold, Host's "experience level was—appeared to be well rounded, and—but as far as his application goes, I felt as though he was a good, strong candidate."  Id.  Arnold also said, "I felt he was a qualified candidate for our second shift operation."  J.A. 147.

14

considering Host for a position, Leading Edge had a position on the second shift available. Arnold testified that he was looking for two or three QCIs and that he had started the second shift by hiring new people and moving some first-shift employees in November 2002. The ALJ found Meyer's testimony that Arnold had offered him a second-shift position to be credible, and there are no extraordinary circumstances to warrant overturning that credibility determination. Leading Edge offered no other evidence in support of Arnold's statement that the company only made written offers of employment. That Leading Edge's work slowed in 2003 does not undermine the fact that it had an open QCI position in November 2002.

B.

Substantial evidence also supports the conclusions of both the ALJ and the Board that Leading Edge's claim that it had no second-shift position was pretextual. Arnold, Leading Edge's only witness, claimed that he did not have a second-shift position for Host but testified that he had started the second shift and was looking to hire two or three QCIs. Arnold claimed that he never made an offer to Meyer because that offer would have been in writing, but he produced no documentary evidence that Leading Edge exclusively made written job offers. He claimed that he checked Host's references, but he only talked with Lockheed managers Parker and Janas, one of whom had been found liable in Host's NLRB action

15

against Lockheed.  Arnold stated that he did not know of Host's troubles with Lockheed, but he testified that he had heard workers speaking about those very troubles.  He claimed that Host lacked written communication skills, but he neither saw nor asked about Host's writing.  Given these inconsistencies in Leading Edge's case, we find sufficient evidence to support the finding of pretext, inference of animus, and consequent violation of 29 U.S.C. § 158(a)(1) and (3).

V.

The Board also concluded that Leading Edge retaliated against Host for his participation in the NLRB proceeding against his former employer.  Substantial evidence supports the ruling in favor of Host's retaliation claim under Section 8(a)(4).  Finding no evidence of extraordinary circumstances that would warrant a reversal, we defer to the ALJ's credibility determinations.  The ALJ determined that Arnold was less than credible when he testified about his lack of knowledge about Host's participation in an unfair labor practices proceeding against Lockheed.  She stated that it was hard to believe that a person in his position would not have been informed of Host's activities and that neither Parker nor Janas mentioned them to him when he inquired about Host.  Arnold testified that he had heard from other workers that Host had been in trouble at Lockheed.  Arnold's testimony about his lack of

16

knowledge stands in stark contrast to Host's testimony about their November 4 phone call.  It also contradicts his own testimony that he had heard of Host's troubles at Lockheed.  In light of the ALJ's credibility findings, we affirm the Board's determination that Leading Edge violated Section 8(a)(4).

## VI.

Substantial evidence in the record as a whole supports the Board's conclusion that Leading Edge did not hire Terry Host because of and in retaliation for his prior protected union activity.  We therefore grant the NLRB's application and order enforcement of the Board's order.

<u>PETITION GRANTED</u>