**INTERNATIONAL PAPER COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**International Brotherhood of Electrical Workers, et al., Intervenors.**

**No. 95–1606.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 24, 1996.

Decided June 27, 1997.

---

Stephen M. Shapiro, Chicago, IL, argued the cause for the petitioner. Timothy S. Bishop, Chicago, IL, and Andrew E. Zelman, New York City, were on brief. Evan M. Tager, Washington, DC, entered an appearance.

David A. Fleischer, Attorney, National Labor Relations Board, Washington, DC, argued the cause for the respondent. Linda R. Sher, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, were on brief.

Robert D. Kurnick, Washington, DC, argued the cause for the intervenors and for amicus curiae AFL–CIO. Marsha S. Berzon, David M. Silberman and Laurence Gold were on joint brief.

Stephen A. Bokat, Robin S. Conrad, Mona C. Zeiberg, Daniel V. Yager, Robert E. Williams, Marshall B. Babson, Stanley R. Strauss, Harold P. Coxson, Jr., Jan Amundson and Maurice Baskin, Washington, DC, were on brief for amici curiae Chamber of Commerce of the United States, et al. Quentin Riegel entered an appearance.

Before WILLIAMS, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Petitioner International Paper Company (IP) challenges a finding by the National Labor Relations Board (Board) that IP's permanent subcontracting of employee jobs during a lawful lockout violated section 8(a)(1), 8(a)(3) and 8(a)(5) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1), 158(a)(3), 158(a)(5). The Board concluded that IP's conduct fell into that class of cases that is so "inherently destructive" of employee rights that antiunion motive can be inferred and need not be proved. IP argues that it implemented the permanent subcontract during the lockout solely for economic reasons and that its action does not support an inference of antiunion motive. We grant IP's petition for review and deny the Board's cross-petition for enforcement.

## I. Background

IP manufactures paper products in over 100 facilities throughout the United States. This case involves a labor dispute at IP's paper mill in Mobile, Alabama, where production and maintenance employees are jointly represented by the United Paperworkers International Union (UPIU) and the International Brotherhood of Electrical Workers (collectively, the Unions). IP and the Unions were parties to a collective bargaining agreement in force at the Mobile plant until January 31, 1987. In early January 1987, IP and the Unions began negotiating for a new contract. During the next few weeks the parties met frequently but were

unable to reach an agreement. On February 20, IP presented its "best and final" offer and stated its intention to lockout employees if its offer was not accepted. The Unions rejected IP's offer and on March 7, IP unilaterally implemented its proposal.

On March 21, in order to prevent a coordinated strike by the UPIU at several other IP facilities, IP locked out 915 production and 285 maintenance employees at the Mobile mill. Before the lockout IP had entered into a contract with BE&K Construction Company (BE&K) to provide temporary maintenance workers in the event of a work stoppage. Once the lockout began, IP continued to operate the Mobile mill with supervisors and workers from other mills and with BE&K workers providing maintenance.

During the lockout IP found that it was saving money by using BE&K workers to perform its maintenance work. Accordingly IP requested BE&K to submit a proposal for a permanent subcontract of the mill's maintenance work. After receiving BE&K's proposal IP concluded that it could ultimately save $7.2 million per year by permanently subcontracting maintenance work. At the first bargaining session after having received BE&K's proposal, IP introduced a proposal stating in part, "the company may, at its option, contract out any or all mill maintenance work on a temporary or permanent basis." JA 1599.

The Unions made a comprehensive request that IP provide them with all materials relating to IP's subcontracting proposal. In response to the Unions' request, at the next negotiating session IP produced BE&K's proposed permanent subcontract and pages 1–6 of IP's cost study on BE&K's proposal. Although IP claimed to have provided all the documentation it possessed, it failed to produce pages 7 and 8 of its cost study. While the Unions insisted they were willing to bargain on the subcontracting proposal, their strong opposition was evidenced by statements like "[D]o you think that we are going to give up 280 jobs? We want to stay alive. You're going to get us killed." JA 1601.

On August 11, 1987, with the lockout still in effect, IP implemented a permanent subcontract with BE&K to perform IP's mainte-nance work after fulfilling its bargaining obligations on the issue. Under the terms of the subcontract either party could terminate the agreement on 30 days' notice. If IP terminated the contract within 3 years without cause, it was required to pay BE&K a fee of $250,000. The Unions were aware of the terms of the permanent subcontract because a copy of the contract was provided to them. Before executing the contract IP sent a letter to BE&K confirming that the end of the lockout would constitute cause to terminate the permanent subcontract without penalty. The Unions were not aware of the letter.

Over the next nine months the parties continued to negotiate but were unable to reach an agreement. On May 3, 1988, upon hearing that the Board's General Counsel intended to issue a complaint alleging that IP's implementation of the permanent subcontract was unlawful, IP canceled the subcontract and reexecuted the agreement with BE&K to provide temporary maintenance work during the remainder of the lockout. IP also withdrew its permanent subcontracting proposal from the bargaining table. The parties nonetheless could not reach agreement and the lockout continued for an additional five months. In October 1988 the parties finally reached an agreement and the lockout ended. While the Unions agreed to allow IP to subcontract, IP agreed to retain enough of its maintenance employees to perform maintenance work at the Mobile mill without subcontracting.

The Board found that IP had violated section 8(a)(3) of the Act by implementing a permanent subcontract for maintenance work during the lockout at the Mobile mill. The Board also found that IP's implementation of the permanent subcontract, because it violated section 8(a)(3), "derivatively" violated section 8(a)(5). The Board found an independent violation of section 8(a)(5) based on IP's failure to produce pages 7 and 8 of its cost study. The Board issued a cease and desist order and awarded backpay to maintenance and production workers for the period that the permanent subcontract had been in effect.

## II. The Section 8(a)(3) Violation [1]

### A.

■ Section 8(a)(3) of the Act makes it an unfair labor practice for an employer to "discriminat[e] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). An employer does not violate section 8(a)(3) every time it acts in a manner that may affect union activity. Rather, an employer's action violates section 8(a)(3) only if it acts specifically with the intent or purpose of encouraging or discouraging union membership. Thus "a finding of a violation under this section will normally turn on the employer's motivation." *American Ship Bldg. Co. v. NLRB,* 380 U.S. 300, 311, 85 S.Ct. 955, 963, 13 L.Ed.2d 855 (1965). This does not mean, however, that a violation of the Act cannot be established absent direct evidence of unlawful motivation. Employer conduct may so tend to discourage union activity that an unlawful purpose will be inferred. This conduct is divided into two categories—"inherently destructive" and "comparatively slight"—depending on the potential effect of the employer's conduct on union activity:

> [I]f it can reasonably be concluded that the employer's discriminatory conduct was "inherently destructive" of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations ... If the adverse effect of the discriminatory conduct is "comparatively slight," an antiunion motivation must be proved to sustain the charge if the employer has come forward with evidence of legitimate and substantial business justifications for the conduct.

*NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967). An employer that engages in inher-

ently destructive conduct may overcome the inference of unlawful intent with sufficient evidence of a legitimate and substantial business justification. *See Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 703, 103 S.Ct. 1467, 1474–75, 75 L.Ed.2d 387 (1983). We have, however, described the employer's burden in justifying inherently destructive conduct as "heavy ... if not impossible." *International Bhd. of Boilermakers, Local 88 v. NLRB,* 858 F.2d 756, 763 (D.C.Cir.1988). Here the Board found that IP's implementation of the permanent subcontract was inherently destructive of employee rights and that IP had failed to meet the heavy burden of establishing a business justification to overcome the inference of unlawful motive. Although we owe deference to the Board's interpretation of the Act if it is "rational and consistent," *NLRB v. United Food & Commercial Workers Union, Local 23,* 484 U.S. 112, 123, 108 S.Ct. 413, 420–21, 98 L.Ed.2d 429 (1987), we will set aside the Board's decision if it rests upon an "erroneous legal foundation." *NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 112–13, 76 S.Ct. 679, 684–85, 100 L.Ed. 975 (1956). In the Supreme Court's words, "Congress has not given the Board untrammeled authority to catalogue which economic devices shall be deemed freighted with indicia of unlawful intent." *NLRB v. Brown,* 380 U.S. 278, 292, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965) (citing *NLRB v. Insurance Agents' Int'l Union,* 361 U.S. 477, 498, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960)).

We begin our analysis by isolating the narrow sliver of IP's conduct that is alleged to be unlawful. The lockout itself did not violate the Act. *See American Ship Bldg.,* 380 U.S. at 316–17, 85 S.Ct. at 966–67. Likewise, IP's temporary subcontract during the lockout did not violate the Act. *See Boilermakers,* 858 F.2d at 769. Permanent subcontracting of bargaining unit work is a mandatory subject of collective bargaining. *See Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 214–15, 85 S.Ct. 398, 404–05, 13

---

1. The Board found that the conduct discussed *infra* also violated section 8(a)(1) of the Act. Its additional finding does not alter our analysis because "the Supreme Court has fashioned a single framework for analyzing alleged unfair practice violations in cases such as this one, where the employer is charged with violations of both sections 8(a)(1) and 8(a)(3)." *International Bhd. of Boilermakers, Local 88 v. NLRB,* 858 F.2d 756, 761–62 (D.C.Cir.1988).

L.Ed.2d 233 (1964). Therefore, IP's *proposal* to implement the permanent subcontract when the lockout ended was also lawful.[2] Finally, because subcontracting is a mandatory subject of bargaining, IP would have been free to implement its permanent subcontract proposal (at least once the lockout ended) after bargaining to impasse. *See Brown v. Pro Football, Inc.*, 50 F.3d 1041, 1051 (D.C.Cir.1995), *aff'd*, —— U.S. ——, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996). In short, under both Supreme Court and circuit precedent, it would have been entirely lawful for IP to lockout its employees, implement a temporary subcontract, propose a permanent subcontract during the lockout and implement the permanent subcontract the day after the lockout ended (assuming impasse had been reached). We conclude that IP's implementation of the permanent subcontract while the lockout was in progress but only after having fulfilled its bargaining obligations on the issue produced too minimal an effect to place IP's conduct in the inherently destructive category.

### B.

Whether employer conduct is inherently destructive of employee rights turns upon the distinction between substance and process in collective bargaining. *Boilermakers,* 858 F.2d at 763. Or, to use the *Boilermakers* formulation, employees are guaranteed the "right to bargain, not [the] right to *a* bargain." *Id.* (emphasis in original). In *Boilermakers* the court assessed two potential collective bargaining process concerns when an employer hires *temporary* replacements during a lockout—creating cleavage among employees and producing a belief in employees that bargaining collectively is futile—and concluded that the collective bargaining process concerns did not in fact render the employer's conduct inherently destructive. *Id.* at 763–64. Today we con-

clude the same two concerns do not make IP's action in this case—hiring *permanent* replacements[3] during a lockout—inherently destructive.

The Unions contend that IP's implementation of the permanent subcontract caused a cleavage problem because it meant that IP's production employees would have to work with BE&K maintenance workers. The cleavage concern the *Boilermakers* court addressed, however, involved division among employees. 858 F.2d at 764. Here, assuming subcontractors remained after the lockout, there would be no divide *among employees* because the subcontractors would not be employees. The distinction is an important one. The goal of our inquiry is to maintain the integrity of the collective bargaining process and cleavage among employees has an adverse effect on the bargaining process if there is division *within* a bargaining unit. To the extent the members of a bargaining unit work at cross-purposes it is less likely they can present a united front and bargain collectively with an employer. That is not a concern here because the subcontracted maintenance workers would not be bargaining together with the production employees in the future. Accordingly, we conclude that IP's implementation of the permanent subcontract during the lockout did not create employee divisiveness adversely affecting the process of collective bargaining.

*Boilermakers* identified a second factor that could affect the collective bargaining process—fostering the belief in employees that collective bargaining is futile. The Unions contend and the Board found that IP's implementation of the subcontract made employees believe collective bargaining was futile because IP's conduct sent the message that the consequence of collective bargaining was that employees would lose their jobs. *International Paper Co.,* 319

---

**2.** The Unions originally alleged that the timing of the proposal was unlawful. The Unions filed an unfair labor practice charge claiming that IP violated the Act because IP made its proposal after it had unilaterally implemented its "best and final" offer. The Unions' timing claim was rejected by a Board regional director and the appeal of the dismissal was denied. *International Paper Co.,* 319 N.L.R.B. 1253, 1256 (1995).

**3.** We note that IP's permanent replacements were not replacement *employees* as were the temporary replacements in *Boilermakers.* The distinction does not make *Boilermakers* inapposite, however; indeed, regarding the cleavage concern, *see discussion infra,* the distinction brings this case squarely within *Boilermakers.*

N.L.R.B. 1253, 1273, 1995 WL 793266 (1995). We disagree. They could have received the same message from the lawful *proposal* to permanently subcontract or from a lawful subcontract implemented *outside* the lockout context. Implementation during lockout is not so different from a proposal during lockout or implementation outside lockout to produce the prohibited employee futility resulting from inherently destructive employer conduct. Employees may believe that the collective bargaining process has extracted concessions from the employer that have made the employer's labor costs high enough to increase the likelihood the employer will subcontract. But that risk is omnipresent for employees who engage in collective bargaining. "Indeed, anytime a union secures economic gains through the collective bargaining process, it runs the calculated risk that the increased costs may eventually compel the employer to adopt cost-motivated changes such as layoffs or subcontracting." *P.W. Supermarkets, Inc.,* 269 N.L.R.B. 839, 841, 1984 WL 36258 (1984).

In its decision the Board examined two additional factors purportedly relevant to the determination whether IP's conduct was inherently destructive. First, the Board looked to the "severity of the harm to employees' Section 7 rights." 319 N.L.R.B. at 1269. The Board concluded that the criterion supported a finding of inherently destructive employer conduct because the permanent subcontract would have permanently put the maintenance workers (or production workers with less seniority who were bumped) out of work, the "most severe penalty unit maintenance employees could have suffered." 319 N.L.R.B. at 1270. The same result would have occurred, however, had IP implemented the permanent subcontract (after bargaining to impasse) outside the lockout context—a lawful action. The severity criterion, then, does not support a finding that implementation of the permanent subcontract was inherently destructive. Second, the Board looked to the "temporal impact of the employer's conduct." *Id.* at 1269. The Board distinguished an employer's attempt to pressure union members to accept a particular proposal, which is not indicative of inherently destructive conduct, from employer action that "creates visible and continuing obstacles to the future exercise of employee rights," *id.* (quoting *Inter–Collegiate Press v. NLRB,* 486 F.2d 837, 845 (8th Cir.1973), *cert. denied,* 416 U.S. 938, 94 S.Ct. 1939, 40 L.Ed.2d 288 (1974)), which, according to the Board, is indicative of inherently destructive behavior. In concluding that IP's implementation of the permanent subcontract would present an obstacle to the *future* exercise of employee rights, the Board assumed that the continuing presence of the BE&K workers after the lockout ended would inhibit future collective bargaining. This is the same cleavage concern we have rejected because it shows, at most, simply that implementation of the permanent subcontract could affect "[the] bargain," *Boilermakers,* 858 F.2d at 763, as opposed to the process of collective bargaining between the parties.

We find further support for our conclusion that IP's implementation of the permanent subcontract during a lockout was not inherently destructive of employee rights in the few Supreme Court cases that have found inherently destructive employer conduct. In *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963), the employer, during a strike, granted 20 years of superseniority to only two groups of employees: replacement workers and workers who broke the strike. In *NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), the employer granted certain vacation benefits to replacement workers, non-strikers and returning strikers not granted to employees who continued to strike. Finally, and most recently, in *Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983), the employer disciplined union leaders more severely than nonunion leaders. In each of these cases, the employer treated employees *within* a bargaining unit differently depending upon the degree of their union activity.

By contrast IP did not distinguish among the members of the bargaining unit. The maintenance workers perhaps had the most to lose—not based on their union activity but because those were the positions IP subcon-

tracted. In other words there was no correlation between degree of union activity and negative consequences to union activists. Granted, the Supreme Court has not held that differential treatment within the bargaining unit is a necessary ingredient of inherently destructive employer conduct. We likewise express no opinion on whether there may exist a set of facts lacking such differential treatment but nonetheless qualifying as inherently destructive. We simply follow the Supreme Court cases to date, all of which found employer conduct to be inherently destructive where the employer differentiated among members of the bargaining unit. IP's conduct does not fit that mold.

### C.

In *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938), the Supreme Court held that an employer may hire permanent replacements for striking workers without violating the Act because the employer has "the right to protect and continue his business by supplying places left vacant by strikers," *id.* at 345, 58 S.Ct. at 911. We believe that an employer's implementation of a permanent subcontract during a lockout is sufficiently analogous to the replacement of workers during a strike to fall within *Mackay*. There are important pragmatic reasons for treating the strike and lockout cases the same. *See Boilermakers*, 858 F.2d at 768. It may be within an employer's power to provoke a strike by insisting on terms unacceptable to its employees. Because *Mackay* allows permanent replacements during a strike, a contrary rule in the lockout scenario could provide an employer the incentive to provoke a strike in order to accomplish what could not be accomplished by locking out employees. *Id.* at 768–69. Provocation would be undesirable because "[s]uch tactics might poison the atmosphere more than a candid resort to a lockout and might also create bargaining gaps that might

otherwise be avoided in the bargaining process." *Id.* at 769 (quoting Bernard D. Meltzer, *The Lockout Cases*, 1965 Sup.Ct. Rev. 87, 104–05) (alteration added). The requirement of good faith bargaining under the Act does provide some constraint on an employer's ability to adopt this strategy. *See, e.g., Land Air Delivery, Inc. v. NLRB*, 862 F.2d 354, 357–58 (D.C.Cir.1988) (employer has duty to bargain before implementing permanent subcontract because "permanent subcontract diminishes the bargaining unit by the scope of the subcontract"), *cert. denied*, 493 U.S. 810, 110 S.Ct. 52, 107 L.Ed.2d 21 (1989). Nevertheless, an employer might attempt to provoke a strike while going to the edge of what counts as good faith bargaining. As we stated in *Boilermakers*, "there is no reason to create an incentive for an employer artfully to precipitate a strike." 858 F.2d at 768–69. We used this rationale in *Boilermakers* to conclude that it is permissible for an employer to use temporary replacements during a lockout. *Id. Boilermakers* contains dictum to the effect that the same reasoning might not apply to the case of permanent replacements.[4] We suggested that permanent replacement raises somewhat different considerations because, if permanent replacements are available, employees may accept the employer's terms no matter what—thus making it impossible for the employer to precipitate a strike. The point we made in *Boilermakers* suggests that an employer may have greater difficulty precipitating a strike if the labor market can provide permanent instead of temporary replacements. Nonetheless in both instances the identical concern exists that the employer will attempt to precipitate a strike while purporting to be engaged in good faith bargaining. Thus both cases raise the problem of employer brinkmanship that may "poison the atmosphere" of collective bargaining. Meltzer, *The Lockout Cases*, 1965 Sup.Ct. Rev. at 105.[5]

---

4. "We do not mean to suggest that a lockout followed by *permanent* replacements would necessarily be a lawful tactic under the Labor Act; we express no opinion on that question, as it is not before us today, except to note that it raises somewhat different concerns than those suggested by a *strike* with permanent replacements." 858 F.2d at 769 (emphasis in original).

5. In *Boilermakers* we also discussed whether a "lockout, followed by permanent replacements, might too easily become a device for union busting." 858 F.2d at 769 (quoting Meltzer, *The Lockout Cases*, 1965 Sup.Ct. Rev. at 104). Ability to "bust" a union, presumably, turns primarily on whether the union presses demands vastly out of line with available alternatives. Moreover,

#### D.

Having found that IP's conduct had a comparatively slight impact on employee rights, we now address whether IP met its burden in showing that its implementation of the permanent subcontract was based on legitimate and substantial business reasons. This question was not addressed by the Board. Instead, the Board analyzed the business justification issue under the more stringent standard applicable to inherently destructive conduct. *Cf. Boilermakers*, 858 F.2d at 762 n. 2 (test for business justification less stringent for action with "comparatively slight" effect). Nevertheless, we do not think a remand is necessary. There is ample support in the record for our finding that IP has satisfied the business justification requirement for employer conduct with a comparatively slight effect on employee rights.

The record shows that IP enjoyed several economic benefits by implementing the permanent subcontract during the lockout. It cut its overtime costs and eliminated the costs it had been incurring in maintaining an on-site facility where temporary replacements ate and lived. By implementing the permanent subcontract, IP was also able to obtain a reduction in BE&K's "multiplier," the number by which BE&K multiplied its costs to determine the price it charged IP. Finally, the record shows that after three years the permanent subcontract would save IP $7.2 million per year compared to the cost of continuing maintenance in-house. Because of transition costs the savings in the first three years were projected to be $842,-000, $5.42 million and $5.541 million respectively. By implementing the permanent subcontract during the lockout, as opposed to waiting until the lockout ended, IP would have been able to realize the maximum savings of the permanent subcontract sooner. We conclude that these economic reasons constituted legitimate and substantial business justifications for IP's conduct, which conduct, as discussed earlier, had a comparatively slight effect on employee rights.[6]

### III. The Section 8(a)(5) Violations

Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). The Board found that IP committed two violations of section 8(a)(5). First, the Board found that IP violated section 8(a)(5) by implementing the permanent subcontract. The Board reasoned from its conclusion that the implementation was inherently destructive and therefore violated section 8(a)(3) of the Act. The Board's theory was that an employer violates section 8(a)(5) if it unilaterally implements (even after bargaining to impasse) a proposal that independently violates another section of the Act. In other words, the Board found that IP's section 8(a)(3) violation "derivatively vio-

---

although we conclude that IP's implementation of the permanent subcontract during lockout was not inherently destructive of employee rights, the permanent subcontract did have a "comparatively slight" impact on employee rights because IP's conduct "could have adversely affected employee rights to some extent." *Great Dane*, 388 U.S. at 34, 87 S.Ct. at 1798. Employer conduct in the comparatively slight category may nonetheless violate the Act if the employer fails to prove that it had a "legitimate and substantial business justification[]" for its conduct. *Id.* Additionally, even if an employer has a legitimate and substantial business justification, thereby putting the burden on the union to prove antiunion animus that arises from conduct with a comparatively slight effect, the court may nonetheless consider *direct* evidence of improper motivation for the employer's conduct. *Id.* These constraints should still any apprehension that our holding today may give an employer a tool by which a union can simply be removed in its discretion.

**6.** If an employer commits a violation with comparatively slight effects but produces evidence of a substantial and business justification it may yet violate section 8(a)(3) if there is "an affirmative showing of improper motivation." *Great Dane*, 388 U.S. at 34, 87 S.Ct. at 1798. There was no such showing here so we need not address this issue. Furthermore, because we conclude that IP's conduct had only a comparatively slight effect on employee rights and that IP had a substantial and legitimate business justification for its actions, it is unnecessary to consider the two additional arguments IP makes on appeal: (1) whether the Board erred in placing the burden of proof on IP to show that the implementation of the permanent subcontract did not prolong the lockout and (2) whether there is substantial evidence on the record as a whole supporting the Board's conclusion that the implementation of the permanent subcontract prolonged the lockout.

lated section 8(a)(5)." 319 N.L.R.B. at 1276. We express no opinion on the legitimacy of the Board's theory. Because the Board's entire rationale depends on its erroneous finding that IP's implementation of the permanent subcontract was inherently destructive of employee rights in violation of section 8(a)(3), its finding of a derivative section 8(a)(5) violation must likewise be reversed.[7]

■ The Board also found that IP violated section 8(a)(5) by failing to produce pages 7 and 8 of its cost study on BE&K's proposed permanent subcontract. Page three of the cost study contained a statement that BE&K intended to begin its maintenance program with 244 hourly mechanics. Pages 7 and 8 contained a breakdown of the jobs those mechanics would perform. We conclude that the content of pages 7 and 8, especially in view of the Unions' refusal to take advantage

of IP's offer to tour the mill and observe the BE&K maintenance workers first-hand, was cumulative of the information IP produced to the Unions and we therefore set aside the Board's conclusion that IP violated section 8(a)(5) by failing to produce the two pages.

\* \* \*

For the foregoing reasons we grant IP's petition for review and deny the Board's cross-petition for enforcement.

*So ordered.*

---

**7.** The ALJ relied on an entirely different rationale in finding that IP's implementation of the permanent subcontract violated section 8(a)(5). The ALJ found that because IP had not produced all the relevant information requested by the Unions there never was a legally cognizable impasse and therefore IP's implementation of the subcontract constituted a unilateral implementation before bargaining to impasse in violation of section 8(a)(5). The Board did not adopt her reasoning, 319 N.L.R.B. at 1253 n. 2, 1275–76, and we express no opinion on it.