**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FRESH FRUIT AND VEGETABLE
WORKERS LOCAL 1096, UNITED
FRUIT COMMERCIAL WORKERS
INTERNATIONAL UNION,
                  *Petitioner,*

     v.

NATIONAL LABOR RELATIONS
BOARD,
                  *Respondent.*

No. 06-72992

NLRB No.
32-CA-21181/21596

OPINION

On Petition for Review of an Order of the
National Labor Relations Board

Argued and Submitted
April 14, 2008—San Francisco, California

Filed August 21, 2008

Before: Ronald M. Gould, Richard R. Clifton, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Clifton

11255

**COUNSEL**

David A. Rosenfeld (argued), Caren P. Spencer, Weinberg, Roger & Rosenfeld, Alameda, California, for the petitioner.

Joan Hoyte (argued), David Habenstreit, Stacy Garrick Zimmerman, National Labor Relations Board, Washington, D.C., for the respondent.

**OPINION**

CLIFTON, Circuit Judge:

The Fresh Fruit and Vegetable Workers Union ("the Union") seeks review of an enforcement order by the National Labor Relations Board ("NLRB") declaring that Bud Antle, Inc., the employer, did not violate the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1) and (3), when, after a fourteen-year lockout, it delayed reinstatement of returning employees by approximately one month and it failed to offer the returning employees the same overtime opportunities available to other employees during a four-week retraining period. Given the unique circumstances of this case, notably the unusually long duration of the lockout, we conclude that the NLRB's decision was supported by substantial evidence, and we deny the petition.

## I.    Factual and Procedural Background

Bud Antle processes and distributes lettuce and other vegetables out of three refrigerated warehouses in California and Arizona. In June 1989, Bud Antle and the Union began negotiating for a new labor contract. When negotiations failed to produce a new agreement, the employees began an economic strike. In response, Bud Antle locked out its union employees and hired temporary replacements. The lockout continued for fourteen years.[1]

During the fourteen-year lockout, many of Bud Antle's operating practices changed. Some changes occurred because of the introduction of new products and others resulted from new technology. For example, the company introduced bagged salads, a product that did not exist when the lockout started in 1989. The need to maintain the freshness of that

---

[1]The legality of the initial strike and the subsequent lockout are not at issue on appeal.

product required a more complicated dating and distribution system than the one used in 1989. Similarly, the company introduced hand held scanners, the use of which required additional knowledge and training.

In 2003, the Teamsters Union attempted to organize the replacement employees. Pursuant to an agreement reached between the two unions and Bud Antle, a representation election was held in which all temporary and striking employees were permitted to vote whether to be represented by the Teamsters, by the Fresh Fruit Workers, or by no union. It was also agreed that, following the certification of election results, the company would offer reinstatement to the locked out employees, the offer would remain open for thirty days, positions would be filled based on seniority, and seniority would be honored equally for locked out and replacement employees. "No union" received a majority of the 253 ballots cast in the election.[2] The election result was certified on December 15, 2003.

Bud Antle sent out letters on Friday, December 19, 2003 offering reinstatement to the 133 previously locked out employees. The letter instructed employees seeking reinstatement to notify the company by Thursday, January 22, 2004. The locked out employees were told that "the date of reinstatement and the job to which you will be reinstated will depend on (1) the number of locked out employees seeking reinstatement, (2) your seniority relative to other employees, including both locked out and replacement employees, and (3) your being qualified to perform the job to which you are recalled." The letter also guaranteed that the employees' pre-lockout seniority would be used for all purposes.

---

[2]According to the tally of ballots, 80 votes were cast in favor of the Teamsters, 7 votes for the Fresh Fruit Workers, and 146 votes against representation by either union. Some ballots were challenged, but a number too small to make a difference in the outcome.

Between December 22, 2003 and January 22, 2004, Bud Antle received twenty-four responses from locked out workers requesting reinstatement. On January 28, Bud Antle sent out letters to those 24 employees notifying them that it had established Monday, February 23, 2004 as the return-to-work day for all formerly locked out employees, that they should report to the company's Yuma, Arizona facility, that the first four weeks of re-employment would consist of mandatory training and orientation, and that they would receive travel pay and a per diem during that time. On the first day of work, only eight of the twenty-four employees reported. One of the employees who returned the first day did not report to work after that, due to a pre-existing injury, reducing the group to seven. None of the other sixteen employees contacted the company again.

For the first four weeks all returning employees were trained in the new systems and methods implemented during the lockout period. In addition, during the training period Bud Antle limited the overtime work assignments given to the seven returning employees, effectively treating them as new employees. The company customarily limited overtime for new employees during initial training because it wanted overtime work to be accomplished as quickly as possible and generally new employees were not as efficient. After the training period, the overtime assignments were distributed evenly.

The Union filed two complaints against Bud Antle: one for its failure to reinstate the locked out employees at an earlier date, and the other for the limitation on overtime assignments for the returning employees during the four-week training period. The two complaints were consolidated, and an administrative law judge ("ALJ"), Burton Litvak, conducted a hearing to determine whether or not Bud Antle had violated Sections 8(a)(3) and (1) of the NLRA. After hearing testimony, the ALJ determined that Bud Antle violated the Act because it did not have a substantial and legitimate business justification for the delay in reinstating the formerly locked

out employees. He ordered the company to make whole the twenty-four employees who had requested reinstatement from the date of their individual acceptances until February 23. Additionally, the ALJ determined that Bud Antle's treatment of the returning employees as new employees for the purpose of overtime assignment was "inherently destructive" of the employees' statutory rights and as such violated the NLRA.

Upon review by a three-member panel of the NLRB, a majority reached a somewhat different conclusion. It unanimously held, in disagreement with the ALJ, that the company had a legitimate and substantial business justification for delaying the employees' reinstatement from December 15 to January 22 and thus did not violate the NLRA by that delay. According to the Board, Bud Antle was justified in delaying reinstatement through January 22 because time was needed to determine which locked out employees would seek to return and, after comparing their seniority with the seniority of the current replacement employees, which employees would actually be reinstated. The company's desire to retrain all of the returning employees and the benefit of doing the retraining of all returning employees at once also served to justify that delay.

The Board concluded that the additional delay from January 23 to February 23 was not supported by a substantial and legitimate business justification, however, thus upholding the ALJ's finding of violation for that part of the delayed re-employment. Although Bud Antle argued to the Board that the second delay was needed to ensure that the returning employees could give two-weeks notice to their then-current employers and so that a particular manager could conduct the training session, the NLRB determined that these reasons were merely for "administrative convenience" and not substantial business reasons. The panel majority then awarded back pay for the period from January 23 to February 23, but only to the seven employees that reported for work on February 23. The ALJ had ordered that all twenty-four employees

who requested reinstatement should be made whole for the delay, but the Board concluded that the employees who did not appear for work, despite indicating their desire to be reinstated, were ineligible for back pay because the union was unable to show that "the date of reinstatement affected their decision to return."

As for the limitation on overtime for the initial four weeks of employment, the NLRB majority concluded, again in disagreement with the ALJ, that the limitation was not "inherently destructive" of the employees' statutory rights and that the company had legitimate and substantial business reasons for limiting the overtime opportunities during the retraining period. The majority noted the significant changes that had occurred during the lockout period:

> With bagged mixed salads, the Respondent, in selecting products to ship, considers a number of issues, including where the customer is located. To illustrate, according to the Respondent, a customer in New York typically will need a product harvested from the field on that day, while a customer in Los Angeles will accept 3-day old product. Thus, it is incumbent on cooler workers to know the date of the product and whether the particular customer will accept that product. Given these requirements, it is essential that employees know where each product is located within the cooler in order to efficiently fill orders, as well as to satisfactorily rotate raw commodities to ensure that these products are as fresh as possible. It is also important to know the location of products for purposes of combining pallets.

Because of these changes the majority concluded that the company had a significant interest in retraining the returning employees. During the retraining period, the employer had a legitimate business interest in ensuring that overtime work was completed in the most efficient manner possible. In order

to maximize the efficiency of returning employees in completing their duties, they needed to be retrained to follow the updated company procedures. The training period also helped the company determine whether the employees could still perform the types of jobs they had performed fourteen years earlier.

Board Member Wilma B. Liebman dissented in part. She concluded that the panel erred in denying the make whole relief to the sixteen employees who indicated a desire to be reinstated but who failed to report to work on February 23. She stated her view that a finding of wrongdoing was presumptive proof that back pay was owed and that the company failed to show that the delayed reinstatement did not affect the employees' decision to return. The dissent also concluded that returning employees were not akin to new employees even though the lockout had spanned fourteen years, and therefore the company's failure to give overtime to returning employees was a violation of the Act.

The Union filed this timely petition for review. Bud Antle has not challenged any portion of the Board's conclusions. Thus the three issues before this court are (1) whether the employer violated the Act by delaying reinstatement from December 15 until January 22; (2) whether the employer violated the Act by failing to offer overtime to the returning employees; and (3) whether the Board erred in granting back pay to only the seven employees who arrived for work on the appointed start date.

## II.   Discussion

We start by noting the deferential standard of review that we apply to petitions for review from the NLRB. We will uphold decisions of the NLRB if the Board's application of the law in a specific instance is supported by substantial evidence. *See Fall River Dyeing & Finishing Corp v. NLRB,* 482 U.S. 27, 42 (1987); *see also Allentown Mack Sales & Serv.,*

*Inc. v. NLRB*, 522 U.S. 359, 366 (1998) ("[W]e must decide whether [the Board's] conclusion is supported by substantial evidence on the record as a whole."). Furthermore, the NLRB has "broad discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial review." *Teamsters Cannery Local 670 v. NLRB*, 856 F.2d 1250, 1259 (9th Cir. 1988).

## A. The Union's Challenges to Employer Conduct as Violations of the NLRA

**[1]** Sections 8(a)(1) and (3) of the NLRA make it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(1) & (3). In determining whether or not a company has violated the NLRA, the relevant inquiry is whether or not the employer's action likely discouraged union membership and was motivated by anti-union animus. *See Metro. Edison Co. v. NLRB*, 460 U.S. 693, 700 (1983).

**[2]** The Supreme Court has established a framework for determining whether employer conduct is unlawfully discriminatory. Some employer conduct is so "inherently discriminatory or destructive" of employee rights that anti-union motivation is inferred. *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 227-28 (1963). If employer conduct is "inherently destructive," the Board may find an improper motive regardless of evidence of a legitimate business justification. *See NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33 (1967).

**[3]** If, on the other hand, "the adverse effect of the discriminatory conduct on employee rights is 'comparatively slight,' " and the employer establishes a legitimate and substantial business justification for its actions, there is no violation of the Act without a finding of an actual anti-union motivation. *Id.* at 34; *NLRB v. Bingham-Willamette Co.*, 857 F.2d 661, 664

(9th Cir. 1988). Applying this framework we address in turn each of the Union's challenges to the Board's decision.[3]

1.   Delay in Reinstatement

We first address the initial one-month delay in reinstatement from December 15 until January 22, the day by which all responses from returning employees were due to the employer. The Union argues that the company's failure to immediately reinstate the locked out employees was "inherently destructive" of the employee's statutory rights because only the unionized locked out employees, and not the replacement employees, suffered "the adversities of being kept out of work." Such conduct, the Union argues, discourages protected activity by punishing an employee's lawful right to strike. We reject this argument because it does not take into account the length of the lockout or the length of the delay itself.

[4] The Supreme Court has defined "inherently destructive" conduct as conduct that "carries with it an inference of unlawful intention so compelling that it is justifiable to disbelieve the employer's protestations of innocent purpose." *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 311-12 (1965); *see Portland Willamette Co. v. NLRB*, 534 F.2d 1331, 1334 (9th Cir. 1976) (defining "inherently destructive conduct" as conduct that has "far reaching effects which would hinder future bargaining" and "create[s] visible and continuing obstacles to the future exercise of employee rights"). If the natural tendency of the employer's actions is to severely "discourage union membership while serving no significant employer interest," then the conduct is "inherently destructive" and discriminatory. *Am. Ship Building*, 380 U.S. at 312; *see also Erie Resistor*, 373 U.S. at 228.

---

[3]The Union also argues that the ALJ and the Board erred in parsing the company's behavior and analyzing each alleged violation individually, as opposed to in the aggregate. This argument is without merit as we have analyzed each allegation of a violation of the NLRA individually in the past. *See L'Eggs Prods., Inc. v. NLRB*, 619 F.2d 1337 (9th Cir. 1980).

**[5]** The Supreme Court's application of this standard is illustrative of employer conduct that necessarily implies discrimination and anti-union animus. In *Erie Resistor*, the Court concluded that an employer granting twenty years of super-seniority to replacement workers and workers who broke the strike was inherently destructive. *See generally Erie Resistor*, 373 U.S. 221. In *Metropolitan Edison*, the Court concluded that an employer's discipline of union leaders more severely than non-union leaders was "inherently destructive" of their statutory rights. 460 U.S. 702-03. "In each of these cases, the employer treated employees within a bargaining unit differently depending upon the degree of their union activity." *Int'l Paper Co. v. NLRB*, 115 F.3d 1045, 1050 (D.C. Cir. 1997) (emphasis omitted). Thus, from the employee's perspective there could be no question that the employees were being punished for their union activities because those employees who chose to engage in union activities were given fewer benefits or were punished as compared to those that did not engage in union activities.

**[6]** Here, the employer's one month delay stands in stark contrast to the above examples of conduct found to be "inherently destructive." This case does not present a reinstatement delay that is relatively long compared to the lockout itself. *See Westpac Electric Inc.,* 321 N.L.R.B. 1322, 1364 (1996) (concluding a reinstatement delay of two to three hours after a three hour strike was "inherently destructive"). In such a case the Board may be justified in concluding that a delay is "inherently destructive" of employee rights because the employees could infer that the delay was instituted to punish their union activities. In contrast, when a reinstatement delay is short relative to the lockout period, it is less likely that employees will view the delay as punishment for a protected activity.

**[7]** After a fourteen-year lockout, a delay of a few more weeks prior to reinstatement does not necessarily express anti-union animus beyond that expressed by the lockout itself.

Indeed, since the workers had just voted against union representation by a substantial margin, it is not clear that the company had much to gain at the time by taking further action to discourage union activity. Given the length of the lockout it is most likely that employees would understand that some period of time was necessary and normal to accomplish the reinstatement, and therefore not view the delay as an action by the company to obstruct or discourage employees from exercising their statutory rights. Moreover, it was reasonable to anticipate that many or most of the locked out employees would likely need some time themselves to prepare for the possible transition: some employees would need time to make their decision, leave their current employers, and prepare to resume working for Bud Antle. Under the circumstances, the Board's conclusion that the delay did not "imply hostile motivation any more than the lockout itself," and thus was not inherently destructive of employee's rights such that antiunion animus can be inferred, is supported by substantial evidence. *See NLRB v. Brown*, 380 U.S. 278, 284 (1965).

The Union challenges the Board's determination that the delay from December 15 to January 22 was supported by a substantial and legitimate business justification.[4] Generally, an employer is obligated to reinstate employees after a lockout without unreasonable delay. "[W]hat is reasonable or unreasonable depends on all the facts and circumstances of a particular case and the existence of legitimate and substantial business reasons for the delay." *Mercy-Memorial Hosp. Corp.*, 231 N.L.R.B. 1108, 1113-14 (1977). We give deference to the Board's expertise in determining whether employer conduct is reasonable and supported by legitimate and substantial business justifications. *See NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378 (1967) (citing *Great Dane Trailers*, 388 U.S. at 33-34) ("It is the primary responsi-

---

[4]The employer has not challenged the Board's conclusion that the delay from January 23-February 23 violated the NLRA and therefore we do not review the Board's findings on this issue.

bility of the Board and not of the courts 'to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy.' ").

The Board found that both of the business justifications offered by the employer in this case, in the circumstances of an unusually lengthy lockout, supported the delay through January 22. First, the Board concluded that the union election agreement justified a one-month delay for the employer to organize the reinstatement of the returning employees. This conclusion was reasonable and supported by substantial evidence. The notice had to be prepared and sent to the locked out employees after the election results were certified, and at least a little time was needed to accomplish that. The agreement with the Union provided that workers would have at least thirty days to respond to the notice. The replacement employees and the locked out employees would have equal seniority rights, so the company would not know which employees would be bumped based on seniority until it had a complete list of employees seeking to return at the end of the notification period on January 22. At the end of the lockout, the facility was operating with 90 replacement employees. There were 133 previously locked out employees to whom notices were sent. Thus, there were potentially more than 220 employees who would seek to fill between 90-100 jobs. Bud Antle could not know, prior to the January 22 deadline, how many employees would be seeking jobs, and what their respective seniority levels would be.[5] Thus, it could not know which employees would be bumped and which would not. Even if, as the Union argues, at least one of the returning

---

[5]Though the company might have assumed that there would not be many employees returning after fourteen years, over 250 individuals voted in the union election, far more than the number of current workers. It was not unreasonable for the company to anticipate at least a possibility that more workers would be returning than turned out to be the case and thus to proceed cautiously with determining who would wind up with the jobs.

employees had sufficient seniority to guarantee that he would be at the front of the line, that could not have been clear for all of the potentially returning employees.

**[8]** The Board also concluded that the company's desire to train all the returning employees together was an independent reason to support the delay. This conclusion was reasonable. Fourteen years had passed. Some level of retraining would seem justified under any circumstances after that long an interval off the job. The changes in the company's operations and products gave further support for the Board's conclusion in this case that it was not unreasonable for the company to retrain the returning employees after fourteen years. It was likewise not unreasonable for the company to wish to train all of the returning employees together. Although the company representative testified that the company had trained new employees individually in the past, he noted that they had never had to train a large number of employees one-on-one before.

The Union argues that *National Football League Management Council*, 309 N.L.R.B. 78 (1992), contradicts the Board's decision and establishes that the delay here was unreasonable and unsupported by a substantial and legitimate business justification. In that case, NFL players agreed to return to work on Thursday, October 15, after a twenty-five-day strike. The NFL Clubs responded by refusing to allow players that were ineligible to play on Wednesday from playing in the upcoming weekend's games. *Id.* at 79. Thus because the striking players agreed to return to work on Thursday, instead of Wednesday, they were unable to play in the games scheduled that week on October 18 and 19. The Board rejected the employer's argument that the delay in reinstatement from October 15 (when the unconditional offer to return to work was tendered) to October 25 or 26 was reasonable and supported by a substantial business justification. The Board concluded that, under the circumstances, the Club's claims that the striking players may not have been in suffi-

cient physical condition to play, and that they had to deal with the administrative inconvenience of juggling both the roster of replacement players and striking players were not substantial and legitimate business justifications for the Wednesday eligibility rule. *See id.* at 82-83.

The Union's citation to *National Football League* and similar decisions fails to deal with the unique circumstances of this lockout, notably its extraordinary duration. A strike lasting twenty-five days is not the same as a lockout lasting fourteen years. Because of the extraordinary time gap, the employer's concerns here were magnified. For example, Bud Antle had to determine where the striking employees were, whether they would return, whether they could continue to perform the job, and how to integrate them back into the company. Although the owners faced similar questions in *National Football League*, it is difficult to ignore the effect a fourteen-year time period can have on the employer's decision making. In *National Football League*, there was other evidence, including contradictory explanations for the delay, and the fact that the Clubs had failed to enforce the Wednesday eligibility rule in a past strike that was twice as long, that made the Board question the credibility of the asserted business justifications. *Id.* at 82. Such concerns are not presented here: the company has not asserted contradictory business justifications. Additionally, the circumstances of the election agreement materially differed from those in *National Football League*. The agreement here required the company to rehire both striking and replacement employees based upon the seniority of all workers. The company, therefore, needed to wait until the end of the reinstatement period to dovetail the list of employees so that it could determine which employees would be hired and retained.

The NLRB has noted the importance of evaluating an employer's conduct based upon the unique circumstances in the record, and properly so. In *Mercy-Memorial Hospital*, the NLRB recognized that reasonable delays in reinstatement can

arise at the conclusion of a lengthy strike. At the close of a three-year strike, state law required that the returning employees be subjected to medical examinations in order to be eligible to work in the employer's hospital. 231 N.L.R.B. at 1114. The Board concluded that the nearly one-month delay in which the company updated employee files, waited to determine which employees would be returning to work, and conducted physical examinations for returning employees was reasonable given "the problems necessarily occasioned by the sudden termination of a 3-year-old strike." *Id.*

**[9]** Given the length of the lockout here, the uncertainties surrounding who would request reinstatement, and the letter of agreement that held the reinstatement period open for thirty days, there was substantial evidence supporting the Board's conclusion that substantial and legitimate business justifications supported the employer's conduct and thus the employer did not violate the NLRA.

### 2.  Denial of Overtime

The Union also challenges the Board's conclusion that the limitation on the returning employees' overtime opportunities during the four-week retraining period did not violate the NLRA.

We first consider whether substantial evidence supported the Board's conclusion that the retraining period and overtime policy was not inherently destructive of the employees' rights. We conclude that there was substantial evidence to support the conclusion that the overtime policy had only a minimal effect on the rights of the employees.

**[10]** The four-week period was temporary, and after the period ended the returning workers were given the same overtime opportunities as all employees. The restrictions on overtime were the only limitations placed on the returning employees. Thus the four-week retraining period was unlikely

to have any "far reaching effects" or "creat[e] visible and continuing obstacles to the future exercise of employee rights" because the limitations were minimal and of short duration. *See Portland Willamette*, 534 F.2d at 1334.

Furthermore, it was reasonable for the Board to conclude that it was unlikely, in light of the length of the lockout, that the returning employees would perceive the retraining period and the limitations on overtime as punishment for exercising their labor rights. After fourteen years of being locked out of Bud Antle, the employees could logically view the retraining and overtime limitations as an ordinary part of their reinstatement and not as an attempt to severely discourage or punish union membership or striking. *See id.*

The Union also challenges the Board's determination that the company had a substantial and legitimate business justification for curtailing the employees' overtime during this period. The Board concluded that the changes in operations that occurred during the fourteen-year period justified the retraining period for two reasons. First, the training period was necessary to update the employees on the procedures used in the coolers and to assess the returning employees' abilities to perform the new tasks. Second, new employees are generally not as adept as existing employees and because overtime is paid at a premium, the company had a significant business interest in determining that the returning employees could perform that work quickly and efficiently. We uphold the Board's conclusions because they are supported by substantial evidence.

As discussed above, although much of the job was similar in 2004 to what it was in 1989, significant changes had occurred that required a new system of handling the vegetables. Many of these changes appear to be specific to the company, not necessarily to the industry generally. It was not unreasonable, then, for the returning employees to be treated like new employees and given a retraining period after four-

teen years out of service with the company. Furthermore, given the premium at which overtime is paid, the employer would reasonably wish to ensure that the work was performed as efficiently as possible. This interest could plausibly be protected by instituting limits on overtime while the employer determined the ability levels of its returning employees.

**[11]** The Union makes two main arguments challenging the Board majority. First, the Union argues that the company generally may not assume that a returning employee is unskilled at performing his or her duties. Although a company may not normally presume that a returning striker cannot perform the job upon return, in this case such a presumption is entirely logical. *Cf. Lehigh Metal Fabricators, Inc.*, 267 N.L.R.B. 568 (1983) (refusing to allow a company to presume that a returning employee could not perform relevant job duties after a sixty-seven-day strike). It was not unreasonable for the Board to conclude that after fourteen years the returning employees would need retraining to bring them up to speed on the new technology and organization.

The Union also argues that the fact that the returning employees were permitted to perform some overtime during their training establishes that the company's business justification was pretextual. The Board rejected the Union's argument because the employer treated all new employees the same, regardless of union affiliation. Additionally, the employees were given full overtime rights as soon as they showed their true abilities. Thus, the Board concluded that the business justification was unlikely to be a pretext for a prejudicial motive. In light of our deferential standard of review, we cannot say that the Board was wrong in its conclusion that the company established a legitimate business justification. We leave it to the Board to strike a balance between the asserted business justifications and the invasion of employee rights and in this case we will not disturb the Board's decision. *See Fleetwood Trailer Co.*, 389 U.S. at 378.

## B.    The Challenge to the Board's Remedy

The Union argues that the Board incorrectly limited back pay to the seven employees who reported to work on February 23 for the reinstatement delay from January 23 to February 23. The Union argues that back pay should have been awarded to all twenty-four employees who responded to the offer of reinstatement.

The NLRA empowers the Board to "take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies" of the Act. *See* 29 U.S.C. § 160(c). A back pay remedy "must be sufficiently tailored to expunge only the actual, and not merely speculative, consequences of the unfair labor practices." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 900 (1983). The Board may not impose a back pay award in the absence of "record evidence as to the circumstances of the individual employees" because such an award would be purely conjectural. *Id.* at 901. The Board enjoys broad discretion and the Union, as the party challenging the remedy, must show that the remedy is "clearly inadequate" in light of the Board's findings. *Teamsters Local Union No. 639 v. NLRB*, 924 F.2d 1078, 1085 (D.C. Cir. 1991). The Union has failed to do so.

**[12]** The Act does not require the Board "to order that which a complaining party may regard as complete relief for every unfair labor practice." *Id.* (internal quotation marks and citations omitted). The Board here awarded back pay to those who were demonstrably harmed by the labor violation, not those that may have been harmed or may have chosen not to accept the reinstatement position for any number of other reasons. In light of the evidence the Board did not abuse its discretion in limiting the back pay award to only those seven employees who reported for work on February 23.

## III.    Conclusion

The NLRB's order must be viewed within the context of the extraordinary circumstances of this case. The employer

was faced with an extensive list of unknowns in dealing with the reinstatement of employees following a fourteen-year lockout. It did not know how many employees would return, what their seniority levels would be, whether they had worked in the same industry during the lockout period, whether they would be familiar with their new procedures, and how long it would take to train the returning employees. Given these unknowns the employer's decisions at issue here were reasonable and the NLRB did not err in concluding that the employer's actions did not violate the NLRA. Additionally, the Board did not abuse its discretion in limiting the back pay award.

**PETITION DENIED.**